CHARLES KELSEY, AND CHARLES M'INTYRE, APPELLANTS, *v.* ALFRED M. HOBBY, AND THOMAS P. BOND, COMPLAINANTS.

On the dissolution of a partnership in 1822, it was agreed with the out-going partners, H. and B., that the debts due to the partnership should be collected by the remaining partners, K. and M'I., and the debts due by the partnership should be paid by them, and a fixed sum should be paid to H. and B., when a sufficient sum was collected for that purpose, beyond the amount of the debts due by the firm. In 1829, K. and M'I. having gone on under this agreement to collect the debts due to, and pay the debts due by the partnership, H. and B. filed a bill in the Circuit Court of the South Carolina district against K. and M'I., charging that there was a surplus of the partnership effects, after paying all the debts, sufficient to pay them the sum which, by the agreement made on the dissolution of the partnership was to be paid to them, and claiming certain Bridge bills, which were to be delivered to them; and praying for an account. The Circuit Court, after proceeding in the case, the accounts having been frequently before a master, and after evidence had been taken, made a decree in favour of H. and B., for a certain sum of money, &c., and the defendants appealed to the Supreme Court. It was contended by the appellants, that the Circuit Court, sitting in Chancery, had no jurisdiction beyond that of compelling a discovery of the amount which K. and M'I. had received under the agreement; and that if any thing was found due to H. and B., they were bound to resort to their action at law on the covenant entered into at the dissolution of the partnership, to recover it. By the Court, this is a clear case for relief as well as for discovery in Chancery. H. and B. were entitled to an account; and if, upon that account, any thing was found to be due to them, they were, upon well-settled Chancery principles, entitled to relief also.

According to the ordinary proceedings of a Court of Chancery, the Court should pass upon each item of an account reported by a master, when the amount received by a party is in controversy. This is necessary to enable the appellate Court to pass its judgment on the items allowed, or disallowed in the inferior Court. But in a case where the remaining partners had received the sum claimed from them, beyond the debts they had agreed to pay, it mattered not how much more they had received; and such a case does not require a statement of the exact amount. The evidence, and accounts, and exceptions being all in the record brought into the appellate Court, the Court can determine whether the sum mentioned is proved to have been collected or not.

During the pendency of the suit in the Chancery in the Circuit Court of South Carolina, one of the complainants, H., being in New York where he had gone on other matters than those connected with the suit, was arrested by the defendant, in a suit at common law, for a claim which was in controversy in the suit in Chancery; and which could have been adjusted in the Chancery suit; and was required to give special bail for his appearance to the suit before a Court in New York. Much difficulty arose in procuring special bail; and having called at the counting-house of K., one of the

z 2

[Kelsey and M'Intyre *v*. Hobby and Bond.]

plaintiffs in the suit, on the subject of the suit, he there executed a release of all claims in the Chancery suit, and acknowledged accounts presented to him to be correct by which the claims in the Chancery suit in South Carolina were admitted to be adjusted. The suit at common law was then discontinued. The defendants in the Circuit Court of South Carolina afterwards filed the release, and moved to dismiss the bill; which motion was opposed on the ground that the release was obtained by duress. The parties went on to take testimony as to the circumstances under which the release was given. Held, that there could be no objection taken to the introduction of the release in this form, under the circumstances of the case. The release having been admitted without exception, no objection could afterwards be made to the manner in which it was introduced. It had the same effect that it would · have had upon a cross-bill, or supplemental answer; and the complainant had the same opportunity of impeaching it.

There is no propriety in requiring technical and formal proceedings when they tend to embarrass and delay the administration of justice; unless they are required by some fixed principles of equity law or practice, which the Court would not be at liberty to disregard.

If the accounts between the parties are impeached, and a release has been obtained, executed by one of the parties in a case depending before a Court of Chancery, the release will not prevent the Court from looking into the settlements; and the release in such a case is entitled to no greater force in a Court of Equity than the settlement of the account on which it was given.

If a release is executed, and a settlement is made of a particular item in an account for which suit has been brought, and in which the party has been arrested, the settlement having been confined to the claim for the damages for which the suit was brought, the mere circumstances of the defendant being detained by the process issued to recover the amount claimed would be no objection to the validity of the agreement and release. But if, while under detention for want of special bail, a release was obtained of other matters than those embraced in the suit, and much more important in amount, and which had been insisted on for years in the suit previously instituted, then in the course of proceeding; neither the circumstances under which the release was taken, and the account connected with it settled, nor the contents of the papers, entitle them to any consideration in a Court of Equity.

APPEAL from the Circuit Court of the United States for the district of South Carolina.

This case was argued by Mr. Coxe, and Mr. Wood, for the appellants; and by Mr. Legaré, for the appellees.

Mr. Chief Justice TANEY delivered the opinion of the Court.

This is an appeal from the decree of the Circuit Court for the district of South Carolina.

It appears from the record that Kelsey, M'Intyre, and Hobby, for some time previous to the 9th of February, 1822, carried on

business in Georgia, as merchants, under the firm of C. Kelsey and Company; and it having been agreed among the partners that Hobby should withdraw from the firm, they, on the day above-mentioned, entered into the following agreement:

"Articles of agreement entered into, at the dissolution of the firm of C. Kelsey and Company, between Alfred M. Hobby, of the first part, and Charles Kelsey and Charles M'Intyre, of the second part, witnesseth, That the said Alfred M. Hobby doth agree to withdraw from the said firm upon the following conditions, viz.: that the said parties of the second part, are to take upon themselves the entire settlement of the business of the said firm, and are to pay to the said A. M. Hobby, after the debts of the said firm are all paid and discharged, and a sufficient sum collected out of the debts now due to the said firm, five thousand five hundred dollars, and in Bridge bills whenever he shall demand them, one thousand one hundred and thirty dollars. And the said A. M. Hobby, for said consideration of the above sums of money to be paid, and the further sum of one dollar to him in hand paid, the receipt whereof is hereby acknowledged, hath relinquished and by these presents doth transfer to the said parties of the second part, all his interest or claims of whatever nature he has, or may have, as partner in the said firm. It is also stipulated and agreed, that the said A. M. Hobby of the first part, in consideration as above specified, is to protect the said parties of the second part, from a certain judgment obtained against said firm by the branch of the United States Bank, in this city, and to hold them harmless from any balance, should there be any due, after the conclusion of the settlement between John M'Kinnie and Thomas Gardner, respecting the said judgment. And for the faithful discharge of this agreement, we bind ourselves, our heirs, executors, administrators, or assigns."

At the time this agreement was executed, an inventory was taken of the assets and debts of the firm, by which it appeared that the goods and property on hand, together with the debts due to the partnership, were estimated at thirty-eight thousand one hundred and sixty-four dollars and ninety-six cents; and that the debts due from it amounted to twenty-six thousand fifty-seven dollars and ninety-one cents, and that this schedule formed the basis of the agreement.

In November, 1829, Hobby filed his bill against Kelsey and M'Intyre, charging that there was a surplus of partnership effects after paying all the debts sufficient to satisfy the five thousand five hundred dollars mentioned in the contract, as well as the Bridge bills, and praying an account. These Bridge bills were notes issued by a company who had built a bridge, in the state of Georgia; and these notes circulated as money, but at a heavy discount.

On the 7th of February, 1830, M'Intyre put in his separate answer, in which he denies that the assets of the partnership produced the surplus charged by the complainant; and exhibited an account according to which the funds of the partnership realized only twenty-nine thousand five hundred and eighty dollars and eighty-three cents, and the debts paid amounted to twenty-eight thousand eight hundred and seventy-four dollars, and sixty-six cents; and he insisted that large sums were also paid by them for interest on the debts of the firm, and heavy expenses incurred, which were not introduced into this account, but for which Kelsey and M'Intyre ought to be allowed credit; and that when these sums were added, they would amount to considerably more than had been collected; and that in addition to this, they are entitled to an allowance of two and a half per cent. on all sums collected and paid by them. He also averred that Hobby did not perform his part of the agreement, and that an execution was afterwards issued by the branch of the United States Bank, and the goods of Kelsey and M'Intyre seized for the debt against which Hobby had covenanted to save them harmless; and that by reason of that execution and seizure, they were put to great expense, and were seriously injured in their credit and embarrassed in their business as merchants; and insisted that they were absolved from their agreement by the failure of Hobby to perform his part. The answer further stated that although Kelsey and M'Intyre denied the right of the complainant to the Bridge bills he claimed, yet they were willing to give him an order for them on the attorney in whose hands they had been placed for suit, and who had prosecuted the claim to judgment. That the respondent had always been ready to account with the complainant, Hobby, and to deliver him these bills, but that no demand was made until this suit was about to be instituted.

Kelsey, the other respondent, had removed to New York a short time before the bill was filed, and his answer was not put in until January 10, 1838.    This answer is in substance the same with that of M'Intyre, to which it refers.

There was a general replication to these answers, and the accounts referred to a master, by order of the Court; when his report came in, many exceptions were filed to it on both sides; and upon hearing, the Court set aside the report, and returned it again to the master, with directions as to the principles on which it was to be stated.    A good deal of testimony was taken on both sides, and the master made a second report at April term, 1839, according to which the respondents had paid two thousand and thirty-one dollars and five cents, beyond the assets which came to their hands.    Many exceptions were again filed on both sides to this report, and it was by order of the Court again returned to the master with directions to take further proof as to one of the items in controversy.

In the latter end of August, 1839, while the accounts were pending before the master, as hereinbefore mentioned, Hobby went to New York where Kelsey resided and was carrying on business; and a few days after he arrived there, he was arrested at the suit of Kelsey and M'Intyre, upon a claim for four thousand dollars as damages for not having saved them harmless against the debt due the Branch Bank of the United States, according to his covenant in the agreement hereinbefore mentioned.    It seems that Kelsey was advised by his counsel, in New York, that this claim could not be allowed him in the Chancery suit, because the damages were unliquidated.    Being a stranger in the city, he found difficulty in procuring special bail.    But an acquaintance whom he had occasionally met in society, and to whom he applied, entered into a bail-bond to the sheriff conditioned that he would appear to the suit and put in special bail within twenty days after the fourth of September then next ensuing; Hobby assuring him that he expected some of his southern friends to be in New York in a few days, and that he would then be able to relieve him.    The party who thus became his security informed Hobby, in the presence of the officer in whose custody he was, that he could not justify as special bail; and he was not, there-

fore, accepted as security in the bond, until the officer consulted Kelsey's counsel and received his consent.

The southern friends, of whom Hobby spoke, when they arrived offered to become his special bail, but not living in the state of New York they could not be taken without the consent of Kelsey. And Hobby remained in New York, unable to procure special bail until the sixth of September, when he signed an admission of the correctness of an account concerning the whole controversy in the Circuit Court, which had been prepared some time before by one of Kelsey's clerks. According to this account, Kelsey and M'Intyre had paid fifteen thousand eight hundred and fifty-nine dollars seventy-three cents, under the agreement with Hobby, beyond the amount of the partnership funds that came to their hands. And at the same time that he signed the account, he executed the following release:

*Account of C. Kelsey and Company with the old concern of C. Kelsey and Company. United States, South Carolina District. Being Sixth District, United States.*

A. M. Hobby and Thomas C. Bond, }
               *v.*        } Now pending before said
Charles Kelsey and Charles M'Intyre, }       Court.

In Chancery.

In this case, the parties, Alfred M. Hobby and Charles Kelsey have come together, and examined the subject-matters in dispute, and they find the within account correct, and it is hereby admitted to be correct, and every entry in it. And they do not deem it just or equitable that said suit should be further prosecuted. And in consideration of the premises, and one dollar paid, the parties in said suit hereby discharge each other from all demand in the same. And each party releases and discharges the other from all demand of every name and nature, and agree that the said suit should be discontinued. As witness our hands and seals, this sixth day of September, eighteen hundred and thirty-nine:

                            A. M. HOBBY. [L. S.]
                            C. KELSEY.     [L. S.]

Witness to the signatures and seals of A. M. Hobby and C. Kelsey.

     GEO. H. KELSEY.

     B. A. HEGEMON.

[Kelsey and M'Intyre *v.* Hobby and Bond.]

This release was attached to the account settled at the same time; and a letter written by Hobby to his counsel, and shown to Kelsey, stating that they had come to a settlement, and directing the suit in Chancery to be discontinued: and Hobby was thereupon discharged from the arrest, and shortly afterwards left New York.

On the 8th of January, 1840, the release and settlement abovementioned were produced in Court by the solicitors for the respondents, and a motion thereupon made to dismiss the bill. This motion was resisted on the part of the complainant, but the particular grounds upon which it was objected to are not set forth. The order of the Court merely states that the release was impeached by the complainant's counsel, and authorizes both parties to take testimony in regard to the settlement and release. Under this order, sundry depositions were taken and returned on the part of the complainant, to show that the settlement and release were without consideration, and that they were extorted from him by the arrest under which he was detained in New York; his southern friends and acquaintances being refused as bail, because they did not reside in the state, and he being unable to leave the city until the temporary bail he had procured was discharged. And sundry depositions were also taken and returned on the part of Kelsey, to show that there was no harshness or oppression on his part, and no undue advantage taken of Hobby; and that the settlement and release were freely and voluntarily made.

The case came on for final hearing on the 30th of May, 1840, upon the report of the master, and the exceptions filed to it on both sides. The report, which stated as before, a balance of two thousand and thirty-one dollars and ninety-five cents, in favour of Kelsey and M'Intyre, for payments and allowances made to them, over and above the sums realized by them from the partnership effects, was set aside by the Court; and upon the testimony in the cause, the Court proceeded to pass a decree in favour of the complainant, for five thousand five hundred dollars with interest, and for the Bridge bills mentioned in the agreement, and allowing to the respondents a set-off of three hundred dollars, for the damages sustained by reason of the execution issued against them by the Branch Bank of the United States, as

hereinbefore stated. From this decree the respondents appealed to this Court.

This statement of the facts in the case may appear to be tedious; but from the nature of the proceedings it is necessary, in order to show how the points arose which were made in the argument in this Court.

. The appellants contend that the Court of Chancery had no jurisdiction beyond that of compelling a discovery of the amount which Kelsey and M'Intyre had received under the agreement; and that if any thing was found due from them to Hobby, he was·bound to resort to his action at law on the covenant in order to recover it. But the Court think it was a very clear case for relief, as well as discovery in Chancery. It is true he had ceased to be a partner, but the appellants had received the assets of the partnership upon a trust that they would collect them, and pay the debts, for which Hobby was liable as well as themselves; and would pay over to him the sum before mentioned, as soon as they collected enough for that purpose after the payment of debts. He was, therefore, entitled to an account; and if upon that account any thing was found due to him, he was, upon well-settled Chancery principles, entitled to relief also.

. Neither can the objection be sustained as to the mode in which the amount due was ascertained. It is true, that according to the ordinary mode of proceeding in Courts of Equity, instead of setting aside the report of the master, the Court should have passed its judgment upon each of the exceptions, or have remanded the account to the auditor with additional directions as to the principles upon which it was to be stated. And if it had been necessary to ascertain precisely the amount which the appellants had collected over and above the debts they had paid, the proceeding adopted by the Court would have been liable to the objections urged against it. For the decree could not in that case have been reviewed in the appellate Court, and the exact balance ascertained; unless the record showed what items were allowed and what disallowed in the inferior Court. But this is not a case of that description. If the appellants had received·the sum claimed by Hobby beyond the amount of debts paid, it mattered not how much more they had received; and the case did not require a statement of the exact amount. And as the evidence,

and accounts, and exceptions are all in the record, this Court can determine whether the sum mentioned is proved to have been collected or not. · And if it appears to have been received, the decree must be affirmed; even although it may happen that items allowed by the Circuit Court are disallowed here; or items disallowed by that Court are determined here to be correct and properly chargeable. And, as all the testimony is before us, and the exceptions show all of the disputed items, neither party can be taken by surprise.

It would extend this opinion to a most unreasonable length, if the Court were to enter upon a particular and detailed examination of the various disputed items, and of the testimony and calculations relied on by the parties to support their respective claims. Fourteen exceptions were taken to the auditor's report by the complainants, and six by the defendants; and the evidence upon which they depend is voluminous. Four of them require a particular examination and comparison of different accounts, in order to arrive at a just conclusion. We have looked into the whole testimony very carefully, and unless the release and settlement in New York is to be regarded as conclusive, we are satisfied that Kelsey and M'Intyre have received from the partnership assets beyond the amount paid for debts, a larger sum than that decreed against them by the Circuit Court.

This brings us to examine the release, and the account stated at the time it was given.

Some objections have been made as to the manner in which the release was introduced into the proceedings. It was filed in the cause, and a motion thereupon made to dismiss the bill; and it is said that being executed while the suit was pending, and after the answers were in, and the accounts before the master, it should have been brought before the Court by a crossbill or supplemental answer, and could not in that stage of the proceedings be noticed by the Court in any other way. It is a sufficient answer to this objection to say that it was admitted in evidence without exception, and both parties treated it as properly in the cause; and the complainant proceeded to take testimony to show that it was obtained from him by duress, and the defendants to show that it was freely and voluntarily given. It had the same effect that it would have had upon a crossbill or supplemental

answer, and the complainant had the same opportunity of impeaching it. And there is no propriety in requiring technical and formal proceedings, when they tend to embarrass and delay the administration of justice; unless they are required by some fixed principles of equity law or practice, which the Court would not be at liberty to disregard.

The release and account being therefore regularly before the Court, we proceed to inquire into their legal effect, and the degree of weight to which they are entitled. The effect of a release, executed in consideration of the settlements of accounts between the parties is clearly stated in Story's Equity Proceedings, p. 529, sec. 685. If the account is impeached, the release will not prevent the Court from looking into the settlement; and the release in such a case is entitled to no greater force in a Court of Equity than the settlement of the account upon which it was given. In the case before us, the settlement of the account was the only consideration for the release. The complainant, who resides in Georgia, and who had gone to New York upon business, was unexpectedly arrested for a claim which was then pending between the same parties in the Circuit Court of the United States for the district of South Carolina. The suit was brought for damages alleged to have been sustained by the failure of Hobby to indemnify the appellants against the claims of the Branch Bank of the United States hereinbefore mentioned. It is true, that the plaintiffs in the suit were advised by counsel that they could not be allowed for these damages in the proceeding in equity, because they were unliquidated; and they ought not therefore to be held accountable for that error. Yet it 's very clear that the suit should not have been brought; because these damages formed one of the items in controversy between the parties in the suit in Chancery, which had been so long pending between them. And that Court had not only jurisdiction over the subject, but it was bound to ascertain and allow them before it could adjust the account, and grant the relief to which the complainant was entitled. The mode by which a Court of Chancery ascertains the amount in cases of that description, is either by a reference to the master, or by sending an issue of quantum damnificatus to be tried by a jury. The cases upon this subject are collected and arranged in 2 Story's Commentaries on Equity, ch. 19, p. 104.

[Kelsey and M'Intyre v. Hobby and Bond.]

And the damages in question were in fact ascertained by the Court and deducted from the amount due to Hobby in the decree now under examination. But, nevertheless, as Kelsey in this respect acted by the advise of his counsel, if the settlement which afterwards took place had been confined to the claim he was seeking to enforce, the agreement between the parties to fix the damages at any particular amount, would have bound Hobby, unless it was evidently unreasonable and exorbitant; or he could prove it was obtained by improper means. The mere circumstance of his being detained in New York by reason of the process issued to recover the amount claimed, would be no objection to the validity of the agreement. But while Hobby was detained in the manner before stated, and unable to procure special bail, Kelsey obtained from him a release of matters not embraced in this suit, and much more important in amount; and which Hobby had been insisting on for years, and for which he was prosecuting a suit in the Circuit Court. Neither the c rcumstances under which the release was taken, and the account connected with it settled, nor the contents of these papers, can entitle them to weight in a Court of Equity. There is no evidence of any negotiations between the parties respecting this arrangement, previous to the interview at which these papers were signed. Upon that occasion one of the clerks of Kelsey was present. He is one of the witnesses to the release. He does not say who proposed a settlement, but he states that the account admitted by Hobby had been prepared a long time before by one of Mr. Kelsey's clerks; that the examination of the account did not take more than ten minutes. And the interview, at which it was acknowledged and signed, and the release executed, and a letter written by Hobby to his counsel in South Carolina to discontinue the suit against Kelsey and M'Intyre, did not last more than an hour.

This is the testimony of the witness. No books or papers appear to have been produced, or to have been in the city of New York, at the time, in the possession of either party, except the account produced by Kelsey, and signed by him and Hobby. And yet the release states that the parties had "come together and examined the subject-matters in dispute," and found that account correct; and thereby "admitted it to be correct, and every entry in it." And the account too which is thus admitted, con-

tains items for "exchange paid," "loss by discount on money received in collection of the partnership debts," "rent for counting room," travelling expenses, postage, clerk hire, incidental expenses, and sundry others which would have required much time to examine, and the production of many vouchers-before Hobby could have known whether they were correct or not. The account in important particulars differs from the one on which Kelsey and M'Intyre had themselves relied in the Circuit Court of South Carolina; and is more unfavourable to Hobby, by about twenty thousand dollars, than the one which Hobby had been so long insisting on in his suit. Such an account and release, executed under such circumstances, are not entitled to the consideration and weight which belongs to instruments freely executed, and with opportunities of knowledge and examination. So far from strengthening the claims of the appellants, they, in the judgment of the Court, are calculated rather to bring suspicion upon them. They certainly cannot outweigh the testimony taken in the Chancery proceedings; and the decree of the Circuit Court is therefore affirmed.