## Marvine *versus* Drexel's Executors.

1. Marvine holding a contract for the purchase of unimproved city ground the conveyance was made to Drexel at the price Marvine was to pay, he agreeing to sell and pay Marvine one-fourth of the profits, Marvine to pay one-fourth of the interest on the purchase-money and of taxes, &c., Drexel, "as owner, to have full power to sell at such times and for such prices as he may deem proper." *Held*, that Marvine had such an interest in the sales, &c., as would prevent Drexel from exercising his power in a prejudicial manner.

2. Drexel's power of sale was not arbitrary, but limited by a sound discretion, to be exercised for the benefit of Marvine as well as himself.

3. Drexel died having made his will, ordering his executors to sell his real estate "whenever they think proper." As to the Marvine land, the power of sale did not pass to them in an absolute form, but to be exercised according to the spirit and intent of the agreement.

4. The executors and Marvine not agreeing as to the mode of selling, equity would direct a sale in such manner as to serve the joint interests of the parties.

5. In this case the court appointed a receiver to make the sale.

February 13th 1871. Before THOMPSON, C. J., AGNEW, SHARSWOOD and WILLIAMS, JJ. READ, J., at Nisi Prius.

Appeal from the decree of the Court at Nisi Prius: In Equity: No. 9, of July Term 1866.

This was a bill in equity by Edward E. Marvine against Catharine Drexel and others, executors, &c., of Francis M. Drexel, deceased, and Francis A. Drexel, heir at law of said deceased.

The matters in controversy originated in a contract between the plaintiff and Francis M. Drexel under the seals of the parties, dated May 18th 1861. It recited that on the 13th of May 1861, Page and others had conveyed to Drexel a tract of land at the corner of the Buck road and Broad street, containing about 13½ acres, and that James Bond on the same day had conveyed to Drexel two lots adjoining; that the purchase-money of the real estate including $5000, paid by Drexel for expenses, &c., amounted to $112,000; that Drexel had laid out the land in building lots for the purpose of selling the same.

"And whereas, in consideration that the said Francis M. Drexel has been enabled to effect the purchase of said property at a low price through and by means of the efforts of said Edward E. Marvine, the said Francis M. Drexel has agreed to pay to the said Edward E. Marvine, from time to time, a portion of the net profits that may hereafter be realized, he, the said Edward E. Marvine, agreeing to pay or allow to said Francis M. Drexel, a portion of the yearly interest on said purchase-money, and a portion of all municipal charges and yearly taxes charged or hereafter chargeable on said property.

"Now this agreement witnesseth, that the said Francis M. Drexel, in consideration as aforesaid, &c., promises and agrees to

[Marvine *v.* Drexel.]

pay to said Edward E. Marvine, one-fourth of the net profits (if any) that may be realized or made from time to time by a sale or sales of the lots. And the said Edward E. Marvine, in consideration, as aforesaid, promises and agrees to pay or allow to said Francis M. Drexel one-fourth of the lawful interest on said purchase-money, one-fourth of said yearly taxes that are now charged, and that may be hereafter chargeable on said premises, and one-fourth of all the municipal charges that are now or that may hereafter be charged against the same. The said Francis M. Drexel as owner, shall have full power and right to sell all or any part or parts of said property at such time or times and for such price or prices as he may deem proper."

Mr. Drexel died in June 1863. By his will proved June 11th, after giving to his wife his dwelling-house for life, and directing that she should have her dower in all his real estate, he devised the residue equally among his six children. And he provided as follows: "I authorize and empower my executors, for the purpose of dividing my real estate among the devisees and legatees, or for any other purpose, to sell and dispose of all or any part or parts of my real estate either at public or private sale, whenever they think proper, except the dwelling-house * * * devised to my wife, and for such price or prices as my executors may deem proper, and also to sell or convey the same in fee simple or other estate, reserving a yearly ground-rent or ground-rents in the usual manner, payable half-yearly or otherwise, with the usual covenants or otherwise, and to make, execute and deliver good and sufficient deeds for the same to the purchaser or purchasers in fee simple or other less estate."

The executors on or about the 1st of April 1866, advertised the whole of the vacant lots on Broad street for public sale on the 8th of May 1866, in eleven blocks. The plaintiff remonstrated without effect; and finally filed his bill for an injunction, which was granted.

The bill prayed:

1. That the court may declare what are the rights, interest and duties of the parties, with respect to the said lots of ground.

2. That the court shall require that the lots shall be sold in manner most conformable to the rights and interests of the parties, and to the greatest advantage, and free from all doubts as to title. And if necessary to appoint a trustee to sell, or otherwise to execute the trust; and if deemed necessary to appoint a receiver to sell, receive purchase-money and file accounts thereof.

3. That the party to execute the trust shall be required to perform and discharge his duties under direction of the court; to sell, freed and discharged from the lien of the decedent's debts and all other encumbrances; and after account taken to divide the profits between the parties according to their respective rights.

[Marvine *v.* Drexel.]

4. For an injunction against any sale in any manner otherwise than may be decreed by the court, and lastly for general relief.

The case was referred to C. H. T. Collis, Esquire, as examiner; and on the coming in of his report, he and Edward Olmsted, Esquire, were appointed masters.

The masters reported:— * * *

"Soon after the execution of the contract, Mr. Drexel commenced to make arrangements to dispose of the property. He had plans made, dividing it into building lots. As the mode of sale which the complainant alleges was contemplated by the agreement, and which he asks to be allowed to prove was the one intended by the parties, is peculiar to this city, it is proper it should be explained. An owner of vacant land arranges with his intended purchaser, the size and character of the buildings that the neighborhood will justify, and the dimensions of the lots suitable for them. The lot has a price put upon it and the cost of the proposed buildings ascertained. The owner then agrees to advance one-half, or more or less, as the case may be, of the respective cost, and the purchaser mortgages to him the lot for its price and the proportion of the cost of building which has been agreed upon. The purchaser, who in most cases is a builder, agrees to furnish the balance of the cost of the buildings. This is the mode in which owners of large lots in this city realize their value."

After stating some of the evidence, the report proceeded:—* * *

"In fine, the evidence shows that the mode of selling by making advances was a favorite one with Mr. Drexel, as well because a better price could be obtained, as that it gave him opportunities to invest his money in mortgages and ground-rents, which he considered among the safest of investments. No doubt it was his intention to dispose of this property by making advances, and this we report to be a fact fully established by the evidence, and if he had lived he would doubtless have covered it with buildings paid for with his money.

"Whether he bound himself to sell in this manner is another question, which will be considered hereafter." * * *

"The complainant produced witnesses to show that it was intended by the parties to the agreement of May 18th 1861, that the sales there mentioned should be sales of lots, with advances of the sort mentioned. This testimony was received by the examiner under exceptions from the counsel of the defendants, that testimony was not admissible to vary the terms of the written contract. The masters decided to receive evidence to show that when the parties by the terms of the contract provided for sales, they meant sales by advances." * * *

[Marvine *v.* Drexel.]

After stating and discussing the evidence on this point, the masters said:—

\* \* \* " The evidence fails to satisfy the masters that anything was omitted from the agreement that the parties intended to place there. No doubt, as has been already stated, Mr. Drexel meant to cover this property with buildings. But the evidence has not convinced us that he meant to bind himself to do this." \* \* \*

They further decided,—\* \* \*

" That Mr. Drexel's executors would not be bound to carry out a contract, to make advances on the sale of the property in question, unless the contract so provided, or Mr. Drexel had directed by his will that it should be done. Neither the one nor the other exists."

They further said:—

\* \* \* " Mr. Marvine's one-fourth interest in the net profits from the sales of the lot was not a mere gift to him by Mr. Drexel. He paid a consideration for it. The agreement being under seal, imports that. The evidence shows that the amount of the profits he was to receive was the subject of negotiation with Drexel. People do not negotiate about gifts. The agreement itself recites that in consequence of the efforts of Marvine, Drexel has been able to purchase the property at a low price. But his interest in the proceeds of the property to the extent of one-fourth of the net profits, is not denied. The controversy between the parties is only as to the mode of making profitable sales.

" Mr. Drexel's executors insist that they may sell as they deem most advantageous for the estate they represent ; Mr. Marvine, that they can only sell as by his interpretation of the agreement Drexel covenanted to sell.

" The masters do not agree with either of these views.

" They are of opinion that Mr. Marvine is entitled to require that the executors shall sell to the best advantage, if that can reasonably be ascertained, but that the executors are not obliged to sell and make advances ; and further, that as Mr. Drexel's estate is paying interest on the purchase-money, and for taxes and the like, that Mr. Marvine cannot insist that the time for realizing shall be postponed till the highest anticipated price can be realized.

" The mode of sale attempted by the executors is shown by the evidence to have been a ruinous one, and the masters report that such sale should not be allowed."

The masters recommend that it be decreed that the executors of Mr. Drexel expose the property at public sale in the following manner, namely, in lots as described in the plan set forth in the testimony, and called plan No. 1.

1. That the corner lots be sold separately, the purchaser to pay one-third cash, and the balance to be secured by bond and mort-

gage on the premises, the mortgages to be payable in five years from their date.

2. That the lots next the corners be then exposed for sale in like manner and on the like terms, the purchaser of the first lot to be allowed to take at the same price any number not exceeding ten, and every subsequent purchaser to have the like privilege.

3. That the parties, complainants and defendants, have permission to purchase as if they were strangers.

4. That after the whole of the lots shall be sold, if the cash proceeds and the mortgages of other than the parties to this suit will suffice, the same shall be paid and delivered to the defendants in payment of the purchase-money and interest, taxes and other expenses properly chargeable against the property paid by Mr. Drexel or his executors, or for which they or the property may be liable.

5. If the parties purchase, then the property purchased by the defendants shall, to the extent of the debt so owing by the said property as aforesaid, be held and taken by them as payment thereof, and the balance be divided, three-fourths to the executors of Mr. Drexel, in trust for the purposes of his will, and the balance to Mr. Marvine.

6. That the parties be decreed to convey to each other or to other purchasers, as may be required to carry out the purposes herein indicated.

7. That before said sale the defendants furnish to Mr. Marvine an account showing the sum properly chargeable against the property.

8. That the sales are not to be conclusive until approved by the court, and either party may except to the confirmation thereof.

9. That such sales shall not take place until sixty days after public notice, and that no sale shall take place between June 1st and October 1st.

10. That after the whole of the lots shall have been sold, and the cash proceeds applied to the repayment of the purchase-money and interest, taxes and other expenses, properly chargeable against the property paid by Mr. Drexel or his executors, or for which they or the property may be liable, the defendants shall take and receive payment of the balance, if any, in mortgages of other than parties to this suit, at par, and when the said indebtedness shall have been thus extinguished, the balance of said mortgages shall be divided three-fourths to defendants and one-fourth to the. plaintiff.

Exceptions were filed to the report by both parties; it was confirmed at Nisi Prius.

Both parties appealed to the Supreme Court, and in a number

of specifications, each assigned the decree of confirmation for error.

*J. S. Price* and *E. K. Price* (with whom was *W. H. Seward*), for Marvine.

*S. Dickson* and *G. Sergeant* (with whom was *J. C. Bullitt*), for Drexel's executors.

The opinion of the court was delivered, February 27th 1871, by
Agnew, J.—The agreement of May 18th 1861 between Mr. Drexel and Mr. Marvine was intended to state the relations between them as to the property described in it, and their final arrangements for its disposition. It shows by its terms that Drexel became the owner thereof, with a full power of sale upon his own terms, and consequently without any trust in the title for Marvine. But though Drexel held the property exempt from any trust in the title for Marvine, the agreement contemplated conversion by sale for their joint benefit. Marvine was to have one-fourth of the net profits, and was bound to pay directly or indirectly by account one-fourth of the interest of the purchase-money ($112,000), and one-fourth of the taxes and municipal charges against the premises. The effect of this arrangement was to give to Marvine such an interest in the sales and conversion of the property as would prevent Drexel from exercising his discretionary power of sale in an unfair or prejudicial manner. For though Drexel was the owner with a power of sale on his own terms, and had paid the purchase-money, it is evident he had obtained the title at a low price by Marvine's instrumentality, and was to be protected by him as to the one-fourth of the property by payment of the interest and taxes and charges on that one-fourth. It is also clear that Marvine took the right to the one-fourth of the net profits in compensation for his relinquishment of title, and .his covenant to pay Drexel the one-fourth of the interest, taxes and charges. Hence in equity Drexel's power of sale was not arbitrary, but was limited by a sound discretion to be exercised for the benefit of Marvine as well as of himself. It therefore did not pass by his will to his executors in an absolute form, but as a power to be exercised according to the spirit and intent of the agreement. The argument is unsound which insists on the possession of an absolute power of sale in the executors, in order to perform their legal duties as executors, for that unqualified power of disposition did not reside in Drexel in his lifetime—it was not despotic in him. But while this is the true effect of the agreement, we discover no binding obligation that Drexel should make *advances* to build up the property as the *contract mode* of making the sales. Doubtless he so intended to do, and Marvine

[Marvine *v.* Drexel.]

believed he would, but we find no sufficient evidence of a contract to do it. Such an understanding might have been fairly the subject of an independent parol agreement not contradictory of the writing, and therefore the masters properly received the evidence to establish it; yet we cannot say that the evidence plainly did prove it, while the entire omission from the writing of a matter so vital to Marvine's interests is strongly persuasive evidence that it was left to the determination of Drexel himself. The expectation, well founded it is probable, that he would sell the property in this mode, which was disappointed only by the death of Drexel, constituted no contract, and had the executors made advances to build up the property it would have been at their own peril. But while this left the executors to make the sale otherwise, they could not make it to the prejudice of Marvine's right if a better mode than the one they proposed was reasonably practicable. Hence in determining to sell regardless of his interests and wishes in a manner *ruinous*, as the masters characterize it, of these interests they were properly enjoined; and equity having taken possession of the case, will direct the sale to be made in such a manner as to serve the joint interests of the parties. See the following authorities: McGowin *v.* Remington, 2 Jones 56–63; Findlay *v.* Keim, 12 P. F. Smith 112; Bank *v.* Biddle, 2 Pars. Eq. Cas. 53; Kelsey *v.* Hobby, 16 Pet. 269; C. & A. Railroad Co. *v.* City of Erie, 1 Grant 212; 3 Casey 382; Meyers *v.* Hill, 10 Wright 12. This can be best done under the order of the court and through the instrumentality of its officer. The executors looking to the special interests of the estate they are to administer, and a speedy settlement of its affairs, occupy a position to some extent adverse to the interests of Marvine, while a master or receiver would hold a middle position. We have therefore made the following decree, to wit:—

> And now, this 27th day of February, A. D. 1871, it is ordered and decreed by this court that all and singular the property, estates and interests mentioned and referred to in the agreement between Francis M. Drexel and Edward E. Marvine, dated May 18th 1861, shall be sold by a receiver, to be agreed upon and chosen by the parties to this bill, and approved by the court, or if they cannot agree, to be appointed by the court.
>
> That the said receiver, after due and sufficient public notice, shall from time to time sell and dispose of at public or private sales all the said premises in lots, divisions or allotments, in such quantities, parts or numbers as shall appear to be most conducive to the interests of all parties, and will bring the best prices for the same. That such sales shall be made from

[Marvine v. Drexel.]

time to time upon mortgages, ground-rents or for cash or partly in any or all said modes; all such sales being made subject to the approval of the court, or a judge thereof sitting at Nisi Prius, either party being at liberty to except to the confirmation thereof.

That the parties, plaintiff and defendants, have leave to purchase as if they were strangers, and to obtain a credit for the purchase-money to a sum not exceeding the amount such party shall be entitled to receive out of the proceeds of said sales.

That before the receiver shall proceed to make such sales, the defendants shall furnish to him a full and true statement and account of the sums chargeable against said property on part of the said Francis M. Drexel, deceased.

That the said defendants, the survivors or survivor of them, shall from time to time, and as often as they shall be required by the receiver, convey by a good and sufficient deed to the purchasers thereof the property sold to them respectively, in pursuance of the power contained in the will of the said Francis M. Drexel, and the said receiver shall also join in the said conveyance, or convey by a separate deed in pursuance of this decree.

That payment of the proceeds of said sales shall be made by the receiver, first to the purchase-money, interest, taxes and municipal charges against the said property, and the expenses attending the said sales and settlement of the same, and next by distribution of the residue to and among the parties according to their several and respective proportions thereof, of all which just and full accounts shall be rendered by the said receiver, subject to the confirmation of the court or a judge thereof at Nisi Prius.

The receiver shall give a bond with sufficient sureties to be approved of by the court or a judge at Nisi Prius, in the sum of $20,000 for the faithful discharge of his duties, and accounting for and paying over all moneys which shall come into his hands from the said sales.

The costs of this suit and all future expenses shall be paid out of the funds in the hands of the receiver. This decree shall be subject to such modifications as the court in banc shall from time to time order and approve.