## Leander S. Butterfield v. Clark Beardsley and others.

*Joint stock associations : Partners.* The relation and position of the parties to this cause, who were members of an unincorporated joint stock association embarked in a common undertaking for their common profit, which was sustained, and agreed to be sustained, by money advanced by each, is held to be such as to justify a court of equity, in order to settle their disputes respecting the distribution of a common fund, to treat them as partners.

*Equity pleading and practice : Report of master : Exceptions.* As a general rule the report of a master, or a commissioner acting as master, is received as true when no exception is taken; and parties who are dissatisfied with such a report should except to it or take some other action appropriate to the objection.

*Equity jurisdiction.* The controversy in this case, which was one relating to the distribution among members of an unincorporated joint stock association, of the common fund arising from a final disposition of the entire assets of the company, is held to be one for equitable cognizance.

*Sales : Joint stock association : Certificates of shares.* The sale which gave rise to the controversy in this case, is held to have been not merely a transfer of individual certificates or stockholding rights, but a final disposition of the ultimate fund or property of the company which the shares represented.

*Company property : Distribution of proceeds : Legal title.* Where property belongs in equity to an association of members, each having an undivided interest in whatever belongs to the company, it is of no consequence in a controversy over the distribution of the proceeds of a sale of the property authorized by the general consent, that the legal title stood in a third person.

*Joint stock association : Distribution of assets : Parties.* Where the property of such a company has been disposed of on the basis of the payment by or through the holder of a portion of the shares of such company, of a certain sum on account of the entire interest of all the other shareholders in such a manner as to extinguish all claim on his part upon the sum so paid, in a suit between the residue of the shareholders for an equal distribution of the proceeds of such sale, his former interest in the company will have no bearing on the result.

*Articles of association: Shareholder: Distribution of fund.* Under articles of association providing that the ownership of a certificate should carry with it an undivided interest in all company property, the fact that a subsequent purchaser of a certificate had never subscribed the articles is of no consequence as affecting his right to a ratable share of the proceeds of a sale of the company's property.

*Heard October 24. Decided January 7.*

Appeal in Chancery from Oakland Circuit.

*Crofoot & Brewer* and *A. C. Baldwin,* for complainant.

*C. & W. N. Draper* and *O. D. Richardson,* for defendants.

GRAVES, CH. J.

This is an appeal by defendants from a decree of the circuit court for the county of Oakland in chancery.

The suit grew out of a contention respecting the distribution of a fund derived from the sale of certain coal oil property in Pennsylvania. The property disposed of was obtained in one of the many speculative joint adventures which became so common a few years since; and after some vicissitudes it was conveyed away, and the complainant asserted a right to participate in the proceeds, but this claim was denied by the parties who had the handling of the fund.

The earnestness of the defense, and the age and experience of the counsel engaged in it, suggested the propriety of delaying a determination until we should be able to re-examine the whole record with critical attention. That task has now been performed. A complete detail of the cause and of the transactions connected with the subject in dispute would be extremely tedious and would expand our opinion beyond reasonable limits. We find it requisite to content ourselves with a glance at some of the main features. There are some matters which have been dwelt upon which do not appear to us as of any practical importance in the case. Among these we may mention the proceeding called an arbitration.

On the 15th of September, 1860, the defendant Jesse A. Heydrick, an operator in oil enterprises, and who resided in Pennsylvania, and appears to have then owned or controlled certain interests in Venango county in that state, was in Pontiac, and he then and there entered into a contract in writing with the defendants Beardsley, Voorheis, Peck, Morris, Millis, and Charles B. Boughner, to convey to them certain of the interests he so owned or controlled, for fifteen thousand dollars. This consideration was to be paid as follows: three thousand dollars in thirty days, three thousand seven hundred and fifty dollars in six months, three thousand seven hundred and fifty dollars in one year, and four thousand five hundred dollars in oil. This was the initial movement, and on the footing of it a joint stock company was organized at Pontiac on the 26th of the same month. The constitution of the company consisted of fifteen written articles. They declared that the company should be called the " Wolverine Oil Company;" that the capital stock should be fifteen thousand dollars, in thirty shares of five hundred dollars each, and that each share should entitle the holder to one-thirtieth part of all the property which should or might in any wise belong to the company, whether held by any, either, or all of its officers, or by any person or persons in trust for the benefit of the company. This provision as to the right of the share-holder was made fundamental. The articles further provided for a board of directors, a president, secretary and treasurer, and for other agencies. Many precise regulations were embodied relative to management and intended to advance the enterprise of the projectors. The facts tend to show that the interest secured by the agreement with Heydrick was to enure to the company, and that they were to stand in the shoes of those who contracted with him. It is impossible to reflect on the circumstances without being persuaded that the formation of the company was closely connected with this contract, and that the purpose just mentioned was formed and understood by all concerned.

The articles were sealed and subscribed and the stock taken by the following persons: Isaac I. Voorheis, two shares; John D. Millis, three shares; Charles B. Boughner, three shares; Orville C. Morris, three shares; Clark Beardsley, two shares; Theodore C. Armstrong, one share; John G. Durkee, one share; Edward W. Peck, three shares; Moses G. Spear, one share; Isaac L. Smith, one share; Jesse A. Heydrick ten shares.

The company organized and proceeded to carry out their plan. All the shareholders except Heydrick lived in Oakland county, and the company seem to have treated that as their true domicile. As he resided in Pennsylvania he does not appear to have taken a personal part in their subsequent business meetings in Pontiac. He was nevertheless a member of the company and jointly interested in its property and affairs. The directors met from time to time and made and collected large assessments on the shares. Assessments were made on Heydrick's shares with the rest, up to the 10th of June, 1862, at which time it appears from the company books the directors assumed to make an assessment of twenty-five dollars and ten cents on each share of the company "owned in Oakland county."

As after this, however, assessments were sometimes made on all the shares and sometimes not, this exceptional mode of assessment is not easily explained by the record. It is possible that Heydrick, when these special occasions arose, may have paid or advanced an equivalent, or been in some position which, in the opinion of the directors, made it improper to assess him in view of the purpose which the assessment contemplated. In any possible aspect of the matter, it is, however, without influence. In the fall of 1860, Boughner, who was one of the directors, was dispatched to Pennsylvania as a special agent of the company, to attend to their interests and to take conveyance of such landed and other interests as they were entitled to or should procure.

Besides the authority springing from the articles, he was furnished with a power of attorney executed under seal, by

Beardsley, Voorheis, Smith, Peck, Spear, Armstrong, Durkee, and Millis. This instrument as drawn, included the name of Heydrick, and his name and description as a shareholder was left to stand in it when it was executed and delivered. He was probably in Pennsylvania and his signature was not put to it. Boughner, however, the donee of the power, through some inadvertence, signed it. On the back of this paper Boughner made a declaration in writing under seal, apparently for the benefit and protection of those who employed him and for whom he was to act, that he would execute and perform the business entrusted to him "for the *use and benefit of the parties to, and members of, the Wolverine Oil Company.*" By this *all* the members were recognized as interested in what was to be done, and not a part of them merely. Morris subsequently executed and transmitted a similar power. Boughner repaired to Venango, and in a short time obtained valuable interests and which seem to have consisted of two-thirds of the properties described in Heydrick's contract, and to have been turned over pursuant to that contract. These grants, or whatever they were, ran to Boughner. As by the agreement Heydrick was to hold an interest of one-third, and by the articles, the property, by whomsoever held, if stock, would belong to the company, and Heydrick had one-third of the shares, it seems to have been understood that he might retain the legal title to one-third. We gather that he did so. The consideration for the transfer to Boughner was derived from the company, and the property was in fact that of the company, and was so considered by all concerned. The ownership of a few shares changed. On the 11th of April, 1861, the defendant Kellam became a shareholder, he having purchased one of the shares originally taken by Morris, and the defendant Andrews, about November, 1864, acquired the three shares of Boughner. The complainant, sometime between the 12th of July, 1861, and the 29th of November, 1864, became owner of one of the shares originally taken by Heydrick. During all this

time, so far as we can gather from the record, the property composing capital stock remained a common fund, and in which every shareholder had an undivided interest. These new proprietors all lived in Oakland county, and as a consequence of complainant's purchase, there came to be twenty-one, instead of twenty Oakland county shareholders. The complainant never subscribed the articles. He was, however, regularly put down, recognized and assessed as a shareholder on and after the date last mentioned.

On that day a meeting of the stockholders was held, at which were represented sixteen of the thirty shares, and among them his share. The meeting was adjourned over to the 30th of November, at which time the same shares appear to have been represented.

At this meeting Andrews, who, as before stated, had succeeded to the interest of Boughner, was chosen director in Boughner's place, and likewise appointed agent "with power to sell the interest of the stockholders of the Wolverine Oil Company residing in Oakland county, provided a satisfactory sale could be made." The meeting expressed itself by resolution, to the effect that no proposition for a sale should be favorably entertained which should offer less than four thousand dollars for each and every share of said company owned in Oakland county. The movements which occurred at this time indicate that there had been overtures to purchase, from some quarter, or at least that something had happened to cause an expectation that offers to buy would be made. The key to the idea of selling the Oakland county interests as separate and distinct from any other, would seem to be that there were grounds for thinking that Heydrick, who controlled all the other shares and lived in Pennsylvania, and was an operator in oil enterprises, was disposed to buy for himself or others. The inference that the Oakland shareholders were acting upon the notion that Heydrick was to be the purchaser, is strengthened by what soon happened. He did buy. Besides, it is to be noticed, that in the summer of 1864, Voorheis had been

sent down as agent, and the company were apprised that he meditated a sale of a portion of the interest of the "company" for twenty thousand dollars. They thereupon directed their secretary to advise him not to sell any part of "our interest, in parcels" and not to offer the whole for less than from one hundred to two hundred thousand dollars.

Voorheis continued to make efforts to effectuate a sale, and at this juncture, and for some reason the record does not explain, the company deemed it expedient to send Andrews down also. He was provided with a power of attorney subscribed by Armstrong, Beardsley, Smith, Kellam, Millis, Spear, Peck, Morris, and complainant, and Morris subjoined to his signature the significant qualification,— "with the understanding that it shan't be sold less than eighty-four thousand dollars,—twenty-one shares."

The names of Voorheis and Heydrick were inserted in the body of this paper as shareholders, and were not erased when it came to be executed and delivered. They were then in Pennsylvania, and did not subscribe. Those who did subscribe must have regarded them as jointly connected in the business. The efforts and negotiations on this occasion appear to have ended in a sale and transfer of all property which had inured to the company in their transactions with Heydrick. The matter is left somewhat obscure by the record, but enough appears to show that Heydrick conducted the negotiations for the buyer, or buyers, and that he either acted as principal or was allowed to deal with the affair as one who was purchasing, wholly or in part, for his own benefit. If any thing belonging to the company stood in his name, the equitable right of the company to it was meant to be cut off by his purchase. It seems to have been the intent to vest in the transferees the whole beneficial interest to which the company had claim, so as to leave nothing which certificates could represent beyond the fund received in exchange, and to so manage the matter that Heydrick could have no interest in that. The trade was not a sale of stock. It was a com-

plete relinquishment of the ultimate capital and property of the company. When it was consummated the "Wolverine Oil Company" had not simply changed its stockholders. It had parted with its estate. It does not appear that any thing was left for certificates to represent but the fund taken in exchange. Voorheis, who seems to have been chief negotiator for the company, first reported that he had sold for eighty-four thousand dollars. A slip occurred, however, and he finally got sixty-two thousand dollars in cash and four thousand shares of oil stock, which is probably worthless. He received the money in Pennsylvania, and at once paid over to Peck twelve thousand dollars as for his share. After his return, and on the 22d of July, 1865, a meeting of the stockholders and directors of the company was held at Pontiac, at which time Voorheis, Armstrong, Andrews, Morris, Peck, Beardsley, Millis, Smith and the complainant were present. It was there voted by the directors that sixty-two thousand dollars should be divided among the Oakland county stockholders, embracing twenty-one shares. This included the complainant's share. At the same time an assessment was made and paid of four dollars seventy-six cents on each of such twenty-one shares to pay an allowed claim of Boughner. On the 12th of August the directors again met at Pontiac, and allowed several claims against the company, including one to Voorheis for his services and expenses. They also assessed each of the Oakland county shares fifty-two dollars and three cents to defray expenses.

On the 13th of September following, however, another meeting of the stockholders and directors was held, at which time Voorheis, Andrews, Peck (by proxy), Morris, Kellam, Millis, Smith, Spear, Beardsley and complainant were present. On this occasion it was resolved that the doings of the meeting on the 22d of July should be rescinded and held for naught,—Morris, Voorheis and complainant resisting. A similar course was pursued in relation to the proceedings of the meeting of the 12th of August,

Voorheis resisting. At this time a vote of censure was also passed against Voorheis, and he was removed from his office of agent and director. They did not go so far as to return the assessment made and collected on the 22d of July. By these and other movements it became apparent that a controlling number of the associates were determined that the complainant should receive no share of the fund realized by the sale, and at length his right to participation was definitely denied.

In February, 1866, the complainant filed his first bill, but omitted to make Heydrick a party. A demurrer was interposed, and the court sustained the demurrer. The bill was then amended by making Heydrick a party, and was again met by demurrer. This, however, was overruled, and all the defendants answered except Heydrick, and the bill as to him was taken as confessed.

We do not consider it necessary to reproduce the matter of the bill, or even to specify the essential parts of it. It proceeds upon the supposition that the complainant and the other associates were, as between themselves, for the purpose of dealing with their community rights in a court of equity, to be considered as partners, and it seeks a winding up of the affairs and an equitable application and appropriation of the effects.

A number of objections were pressed with much earnestness at the hearing. One of them may be here noticed. It was said that the associates were not partners. They certainly had no corporate character, and yet they were embarked in a common undertaking for their common profit, and this common undertaking was sustained, and was agreed to be sustained, by money advanced by each. That their relation and position were such as to justify a court of equity, in order to settle their disputes respecting the distribution of a common fund, to treat them as partners, is a point settled by overwhelming authority. We cite a few of the cases and books bearing on the point.— *Beaumont v. Meredith, 3 Ves. & Beames, 180; Wallworth*

*v. Holt, 4 Myl. & C., 619; Womersley v. Merrit, L. R., 4 Eq. Cases, 695; Richardson v. Hastings, 7 Beav., 323, S. C. id., 301; Whitman v. Porter, 107 Mass., 522; Taft v. Ward, 106 Mass., 518; Harper v. Raymond, 3 Bos., 29; Mann v. Butler, 2 Barb. Ch. R., 362; Townsend v. Goewey, 19 Wend., 424; Cross v. Jackson, 5 Hill, 478; 3 Kent's Com., p. 26; Story on Part., §§ 76, 77, 164, 213; Burgan v. Lyell, 2 Mich., 102; Clagett v. Kilbourne, 1 Black, 346; Brown v. Curtis, 5 Mason, 421; Adams Eq., 247, 239, 240; Willards Eq., chap. 10; Story, Eq. J., §§ 1243, 1255, 1256; Brown v. Gilman, 4 Wheat., 255.*

In February, 1872, the court made an interlocutory decree adjudging that the associates were partners in interest in the property and effects of the Wolverine oil company; that their respective interests were co-extensive with the shares they severally held, and that complainant held one share. The decree set forth and declared who were shareholders, and the quantity of interest of each individual; that Heydrick owned and controlled nine shares independently, and governed the interest which they represented, in a manner distinct from the interest represented by the other twenty-one shares owned in Michigan; that Voorheis acting as agent for the shareholders living in Michigan, and holding twenty-one shares, sold such shares, with the property they represented, and received a large sum of money and other property, and that the fund so obtained equitably belonged to the complainant and the other Michigan shareholders in the ratio of their shares, and that it ought to be divided among the owners after an adjustment of claims and demands between members and against the company.

The decree then proceeded to refer it to a commissioner to ascertain and report what sales, when and for what amount, had been made of any of the property, shares or effects of the company by Voorheis or any of the other defendants except Heydrick, the disposition made of the proceeds, the amount passed over to any of the defendants,

and whether Voorheis still had any property of any kind derived from any such sale, and whether there were any, and if so what, debts against the company which ought to be paid out of the fund.

The commissioner made his report under this decretal order on the 22d of November, 1872. He found and reported that on or about the 9th of February, 1865, Voorheis, acting as the agent of the Michigan stockholders, sold certain property belonging to them, and received therefor in cash sixty thousand dollars; that he also received in cash from Heydrick two thousand dollars and four thousand shares of stock of the Heydrick Bros. oil company; that at a meeting of the Michigan shareholders, July 22d, 1865, they recognized the sum of sixty-two thousand dollars as the amount received in cash by Voorhies as belonging to the Michigan shareholders, including complainant.

The commissioner further found that Voorheis paid to Millis, as company treasurer, for Andrews, eight thousand seven hundred dollars; for Spear, two thousand nine hundred dollars; for Smith, two thousand nine hundred dollars; for Armstrong, two thousand nine hundred dollars; and for Millis himself, eight thousand seven hundred dollars; making twenty-six thousand and one hundred dollars; that he paid to Beardsley, six thousand dollars; to Morris, five thousand five hundred dollars; to Kellam, two thousand nine hundred dollars; to Peck, twelve thousand dollars; to complainant, three hundred dollars; being a total of fifty-two thousand eight hundred dollars paid over to shareholders. He also found that when Voorheis received this money the company owed him nine hundred and sixteen dollars and nine cents, and were otherwise indebted, as near as could be ascertained, to the amount of one hundred and seventy-six dollars and fifty-three cents; that after deducting what was due him for services, Voorheis had in his hands eight thousand two hundred and eighty-three dollars and nine-one cents, besides the oil stock in the Heydrick & Brothers oil company. The commissioner then

stated the sum each shareholder was entitled to on the 22d of July, 1865, the over-payments and deficiencies in sums paid, the interest on the different sums, and the rectifications in the distribution which the principles of the decree required.

No objections appear to have been taken before the commissioner, to the draft or scheme of his report in any particular, and no exceptions appear to have been filed or suggested to the final report in the court below. Neither was there any motion to set it aside or refer it back. If not incorrect or inconsistent upon its face it was entitled to great weight. The defendants, if dissatisfied with it, should have excepted or taken some other action appropriate to the objection.—*Rule 79; Suydam v. Dequindre, Walk. Ch., 23; Dean v. Emerson, 102 Mass., 480; Tyler v. Simmons, 6 Paige, 127; Daubeny v. Coghlan, 12 Sim., 507; Morgan v. Evans, 3 Clk. & Fin., 159, and Am. notes; Mason v. Crosby, 3 Wood. & M., 258; Story v. Livingston, 13 Pet., 359, 375; Harding v. Handy, 11 Wheat., 103, 126.* The general rule is that the report of a master, or commissioner acting as master, is received as true when no exception is taken.

The report standing confirmed under the rule, the case came on on the equity reserved and for further directions, on the 15th of March, 1873, when the court made a final decree. And it was adjudged that sixty-two thousand dollars, less the debts of the company, found to be one thousand ninety-three dollars and sixty-two cents, should be divided among the holders of the twenty-one shares, including complainant, according to the amounts held by them respectively, and according to the detailed statement on that subject in the report, and making two thousand nine hundred dollars and thirty cents as the share of complainant; that such sum should be paid to him with interest from July 22d, 1865, which would give to him at the date of the report, three thousand nine hundred and thirty-five dollars and twelve cents as his share of the fund, principal

and interest; that Peck had received three thousand two hundred and ninety-nine dollars and ten cents in excess of his share, and that within sixty days from the date of the decree he should pay into court such excess, with interest from July 22d, 1865; that Beardsley had received one hundred and ninety-nine dollars and forty cents too much, and should refund in like manner; that if such sums, or enough thereof to equal the amount decreed to complainant, should be got into court, the sum going to complainant should be paid to him thereout and the balance to Voorheis to cover the deficiency of his share; that in the event of a failure to get from Peck and Beardsley enough to pay complainant pursuant to the decree, Voorheis should pay him his quota within the ten days next succeeding the end of the sixty days given them for payment by the decree; that it not appearing that the four thousand shares of oil stock obtained and held by Voorheis possessed any intrinsic value, he must place it in court to await further directions. It was also adjudged that complainant should recover costs against Beardsley, Voorheis, Millis, Andrews, Peck, Morris, Armstrong, Smith, Spear, and Kellam, and that the decree might be enforced by executions. Without pretending to exactness we have here given a substantial summary of the commissioner's report and of the final decree.

The court seems to have adopted the theory that the right of Heydrick in the property owned by or held for the company was not in community with the rights of the other associates, and that in the ultimate disposition which was made, no change was worked in respect to his holding, or the nature of it, if he still continued a formal proprietor; and that the change actually produced only comprehended the property rights represented by the twenty-one Michigan proprietors. Now it is totally unimportant in regard to the result whether this view is embraced, or whether we adopt the construction before suggested, and which appears to me to be authorized, that the arrangement in Pennsylvania was meant to change the status of the entire

property of the "Wolverine Oil Company" and place its tangible estate under a different control; that the arrangement carried out by or through Heydrick for a sale, divested the Wolverine oil company of the substance theretofore represented by shares, and that Heydrick's holding for the company then ceased, and if he continued to hold for any body besides himself, it was for other parties. The question however, as before intimated, is without practical importance, and what is now advanced upon it is to be regarded as simply the impression of one member of the court.

We do not think it needful to discuss in detail the various objections which were pressed on our attention at the hearing, because, after a patient examination of the record we discover no substantial fault in the decree. After this inspection we find that the material grounds of the criticism of the defendants are removed by the application of principles now well settled. · It appears to us very clear that the true controversy was one for equitable cognizance. See authorities before cited, also, *Kelsey v. Hobby, 16 Pet., 269.* We also think it clearly established that the Voorhies sale was not a mere transfer of individual stockholding rights, of certificates held as the evidence that the holders were entitled to interests in the general stock, and which certificates were capable of being transferred without lessening or increasing the property of the company. But it was a final cession of the ultimate fund or property of the company, of that very property which the shares represented.

That the legal title stood in a third person was of no consequence. The property was in equity that of the company, and no one questioned the right of the company.— *Hoxie v. Carr, 1 Sum., 173; 2 Bouvier Inst., p. 94, par. 1457.* If a quantity of oil had been drawn from a company well it must have belonged to the company, and ultimately to the shareholders according to their respective stockholding rights. The same must be true of the well itself, and of the other property. There were no several rights in the common estate. They were all joint. No set of share-

holders were entitled to any separate portion. Each had an undivided interest in whatever belonged to the company, and this could not be altered by turning the common property into cash. Such a step might be one towards a state of things to favor a division, but in itself it could operate no further than as a change in the form of the company property.—*Clagett v. Kilbourne,* and other cases.

It is extremely clear that Heydrick, who held all the shares not owned in Oakland county, had no interest in the fund produced by the sale. He never claimed to have any, and the defendants do not suggest that he was entitled to participate in it. However his exclusion is accounted for, it is a fact insisted upon virtually on all sides, and the consequence is that twenty-one shareholders only are left to partake of the proceeds of the sale of the oil property.

By the constitution of the company the ownership of a certificate carried with it an undivided interest in all company property, whether such property should stand in the name of the company or in some other name; and this special consequence of the fact of ownership of a certificate was not designed to be affected, and was not affected, by mere non-subscription of the articles. No other construction can be placed on them.—*Adams Eq.,* 242 ; *Harper v. Raymond, 3 Bos.,* 29.

The complainant owned a certificate. The fact stands admitted by the company records. A mass, certainly, if not the whole of the property in which he had an undivided interest as such owner was converted into money by the assent of every one of the shareholders of the whole thirty shares. The transaction thus assented to, and which resulted in the conversion, was meant to extinguish and did extinguish the right of the shares still controlled by Heydricks to participation in the new fund produced by the sale to him. There were nine of these shares then controlled by Heydrick. Twenty-one shares, with complainant's, were unexcluded. But it is claimed that twenty of

these are entitled to the whole fund, to the exclusion of the twenty-first share, owned by complainant. We do not see how any such division can be forced upon him. On the contrary, we think he was legally and equitably entitled to a ratable share of the fund.—*2 Bouvier's Inst., pages 135, 136, 130, 131, 132, 133; Story, Eq. J.,* §§ *1243, 1255, 1256.*

We have have not stopped to dilate on the company proceedings in recognizing him whenever burdens were to be borne, and in treating him as a legal member, even when, so far at least as appears, there was no company property to be represented by certificates, other than the fund produced by the Voorheis sale, and still maintaining that he had no interest whatever in the fund.

The decree of the court below should be affirmed, with such variations in regard to time as the delay caused by the appeal has made proper, and the complainant should recover his costs in this court, of the defendants who appealed. The cause should be remanded for the execution of the decree.

CAMPBELL and COOLEY, JJ., concurred.

CHRISTIANCY, J., did not sit in this case.