COBURN *v.* CEDAR VALLEY LAND AND CATTLE COMPANY (Limited).

SAME *v.* SAME.

SAME *v.* SAME.

SAME *v.* SAME.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MISSOURI.

Nos. 139, 140, 141, 142.   Argued and submitted January 9, 1891.—Decided January 26, 1891.

A litigation existed between the appellants and the appellee, which was embodied in two bills, two cross-bills, their respective answers, and the other proceedings therein. A correspondence ensued which resulted in a proposition for compromise and settlement on the one side, which was accepted by the other. Subsequently it appeared that the appellee intended and considered the agreement of settlement to embrace a complete relinquishment and discharge of all claims of either party against the other, while the appellants claimed that they were to retain their disputed claims against the appellee. The appellee thereupon filed a petition in each of the causes, disclosing to the court the correspondence and agreement of settlement and praying for a decree that all matters in controversy " had been settled and compromised by the parties and are decreed and adjudged to be finally settled, and ordering that all the cases be dismissed." The court below, after hearing the parties, found that there had been a full compromise and settlement by agreement of the parties, and ordered each of the bills to be dismissed. A motion to vacate these decrees, and grant a rehearing was overruled. *Held,*

(1) That the parties intended to make a full compromise and settlement of all claims and demands on either side, and that the decree of the court below was right, and should be affirmed;

(2) That no objection having been raised, until after decision rendered, to the proceeding by petition instead of by supplemental or cross-bill, the decree should not be vacated or disturbed on that account; especially as the appellants had appeared in answer and opposition to the petitions, and had introduced affidavits to support their contentions.

THESE cases, as stated in substance by counsel, may be described as follows:

(1) On October 10, 1885, the Cedar Valley Land and Cattle Company, Limited, an English corporation, filed its bill against William N. Ewing and James M. Coburn in the Circuit Court of the United States for the Western District of Missouri, alleging that Stewart and others, having ascertained that the defendants were willing, in conjunction with them, to subscribe to the capital stock of the corporation when formed, agreed among themselves to become the promoters of a corporation for the purpose of purchasing a ranch with the cattle and horses thereon, then the property of one Munson, and situated in the State of Texas; that the name of the corporation was to be the Cedar Valley Land and Cattle Company, Limited, and that plaintiff is the identical corporation in contemplation; that the corporation was formed January 7, 1885, and in the preceding December, Stewart, Burnett, Campbell and Fisher, styling themselves plaintiff's directors and acting as plaintiff's promoters, believing that defendants were willing to undertake and assume the trust in behalf of the proposed corporation, directed and requested defendants to buy the ranch, land and cattle from Munson for plaintiff at the very lowest terms, and defendants accepted the trust; that on December 31, 1884, defendants, in the name of Ewing, in pursuance thereof, concluded negotiations with Munson for the ranch, and purchased it for plaintiff, and Ewing entered into a written contract with Munson, which is set out at length in the bill; that this contract was made for and in behalf of plaintiff, in contemplation of corporate existence, as was the employment of Ewing by the promoters and the contract of purchase, and with the intention that the contract should be adopted by the corporation when formed and enure to its benefit; that said contract was so adopted and the corporation proceeded to carry the same out, and complied with all the terms and conditions of the contract, including the payment of the sums of money therein provided, being $100,000 remitted December 31, 1884, $140,000, May 5, 1885, and $180,000 June 18, 1885, which moneys were entrusted to the defendants to make such payments; and that Ewing, on the 31st of December, 1884, made a declaration of trust that the $100,000 to be

paid on that day was the property of the plaintiff. Plaintiff further averred that in August, 1885, it learned that Coburn and Ewing had secretly agreed with Munson for a commission for selling said property, and had received about $40,000 from him on that account, which was retained out of the moneys remitted, and that defendants agreed to pay Munson for some of his cattle about $18,000 more than he had at first been willing to sell for; and further, that defendants, out of the cash sent them by the company with which to pay Munson, had retained the sum of $60,000, and, in lieu thereof, had conveyed to him a lot and building in Kansas City, belonging to them, worth not more than $45,000. The bill prayed for a decree for such amount as defendants might be found to have received, upon an accounting, etc.

The defendants answered denying that they were promoters of said corporation, and alleging that all their agreements and arrangements as to the character in which they should act in the purchase of said ranch property were made with Burnett, one of the persons named as a promoter and director in the bill, and that Burnett knew that the defendants would be paid a commission by Munson, and that the defendants were openly engaged in the business of selling such property for a compensation; and that the services rendered by defendants involved much labor and were reasonably worth a larger amount than was received. The answer also alleged that plaintiff acquired said ranch for $100,000 less than its actual market value; and that the only connection which defendants had with said corporation was that after it had been organized, Ewing subscribed to its capital stock, pursuant to a contract by which he was appointed its manager for the term of five years.

Exceptions were filed to the sufficiency of this answer, which were referred to a special master for examination and report. This report was made and the exceptions set for hearing. The appeal in this case is No. 139.

(2) On December 8, 1885, Coburn and Ewing filed a cross-bill against the Cattle company, by leave, which alleged that they for a number of years had been partners in the business

of selling property as brokers and for a commission, and that at all the times mentioned in the plaintiff's bill, they had the ranch in their charge for the purpose of selling the same under an agreement for a reasonable compensation to be paid them by Munson; that Burnett, knowing this fact, made an agreement with them to procure a purchaser for said property if they would share their commission with him; that afterwards they were directed by Burnett to buy the property upon terms and conditions and at specified prices known to him; that they entered into the contract with Munson pursuant to directions from Burnett, and expended a large amount of time and labor in the transaction, a reasonable compensation for which was alleged to be $50,000; and that some months afterwards, the corporation, having been organized in the meantime, entered into an agreement with Coburn and Ewing, that, if they would subscribe $100,000 to its capital stock, it would appoint Ewing its manager for the period of five years at a stipulated salary, which proposition was accepted, the sum of $50,000 paid on account of such subscription, and the appointment accordingly made. The cross-bill further alleged that said corporation had attempted to annul the contract so made with Ewing, and, without offering to cancel said subscription or to return any part of the money paid on account thereof, or tendering or offering to pay the reasonable and expected profit arising from said contract, had sought to sequester said stock and had refused to permit its transfer on its books; and that the market value of said stock was $125,000, and the reasonable and expected profit arising out of said contract was $20,000.

The cross-bill prayed for an answer to certain separate interrogatories directed to matters peculiarly within the knowledge of the corporation, and that upon its appearing to the court that Coburn and Ewing were entitled to be paid a reasonable compensation, and that it was the duty of the corporation to pay the same, the court might decree it to Coburn and Ewing, and that the corporation might be required to pay them the value of their stock, less any sum that might be unpaid thereon, and to pay to Ewing the sum of $20,000 on

account of his contemplated profit out of the contract appoint-ing him manager of the corporation, and also for general relief. To this cross-bill the Cattle company filed a demurrer. The appeal in this case is No. 142.

(3) On October 6, 1885, Coburn and Ewing filed their bill against the Cattle company and George D. Fisher in the Cir-cuit Court of Jackson County, Missouri, which alleged that, in March, 1885, Ewing proposed to the defendant company, on behalf and in the name of Coburn and Ewing, to subscribe for two thousand shares of its capital stock, of the par value of $50 each, upon the condition that Ewing should be ap-pointed manager of the company for the period of five years; that this proposition was accepted and Ewing appointed ac-cordingly by the directors of the corporation, and thereupon Coburn and Ewing subscribed for the two thousand shares and paid $50,000 in full of all assessments or calls which had been made on said stock, and certificates had been issued to them accordingly; that Ewing entered upon the duty of manager and had been continuously employed therein ever since; and that on September 7, 1887, the corporation attempted to can-cel and terminate the appointment of Ewing as such manager by written communication, setting forth that " in consequence of the facts which have come to the knowledge of the board of directors connected with your purchase from Mr. Munson," they had decided to annul his appointment, and that Fisher was authorized to take charge of the company's property, and requested the delivery of the same to him accordingly. The bill also alleged that there were peculiar reasons of fitness, etc., for the employment of Ewing, and that Coburn and Ewing would not have subscribed or taken any shares in the capital stock but for the contract to appoint Ewing manager; that Ewing had faithfully performed all his duties and had at no time given the company any just cause for terminating his appointment; and that the contract was of great value to Ewing, and would yield him a sum aggregating $20,500 for the unexpired portion thereof. And the bill further alleged that Fisher was undertaking to prevent Ewing from perform-ing his functions as manager, and to take out of his possession

all property in his hands as such, without offering to pay or refund the value of the stock to Coburn and Ewing, or the reasonable damages accruing to Ewing by reason of the refusal of the company to further perform its contract with him, and without releasing or indemnifying him for certain liabilities he had incurred, and for which he was personally liable, on account of the company, to all of which compensation, reimbursement and indemnity, Coburn and Ewing alleged themselves entitled before Ewing could be discharged from said appointment; and an injunction was prayed accordingly.

This cause was removed to the United States Circuit Court for the Western District of Missouri, and the corporation answered alleging that no such contract was made for the appointment of Ewing, but that the subscription of Coburn and Ewing to the capital stock was unconditional; and that Ewing was appointed as manager, but as an entirely separate and distinct transaction. It was admitted that said appointment was cancelled and terminated by the notice mentioned in the bill, and the grounds for such action were set forth as resting practically on the same facts alleged in the bill of the company in No. 139. The appeal in this case is No. 140.

(4) On November 23, 1885, the Cattle company filed a cross-bill setting forth the alleged employment of Coburn and Ewing on behalf of the intended corporation; the making of the contract with Munson; that Coburn and Ewing had received a commission from Munson secretly; the transactions as to the property in Kansas City, and the alleged overpayment in the purchase of cattle; the cancellation of Ewing's appointment by reason of the premises; and alleging that Ewing had done acts in hostility to the interests of the corporation, which would be imperilled if he were allowed to manage the same. An injunction was prayed restraining Ewing from acting as such manager and in anywise interfering with the property of said corporation.

Coburn and Ewing answered averring substantially the same facts disclosed in their answer in No. 139, their cross-bill in No. 142, and their original bill in No. 140. The application of Coburn and Ewing and of the Cattle company for temporary

injunction's came on for hearing in December, 1885, and the Circuit Court made an order granting the temporary injunction prayed for in the ·cross-bill of the Cattle company. The appeal in this case is No. 141.

The record in No. 141 discloses that upon the cross-bill there was filed an affidavit with exhibits, which showed that a suit had been commenced by Coburn and Ewing against the Cattle company in a State court of Texas and an injunction obtained, which, upon the removal of the cause to the Circuit Court of the United States for the Northern District of Texas, was dissolved by Judge McCormick, upon the ground that where it appeared that plaintiffs had been employed to purchase a ranch and cattle, and had secretly received from the seller a commission, and where one of them had afterwards obtained employment from the company as manager of the ranch and herd, without disclosing the facts, the company had good cause for removing him from a position obtained under such circumstances. The opinion is reported in 25 Fed. Rep. 791.

June 19, 1886, the ·Cattle ·company filed in each of said causes the following " petition for a decree : "

" Now comes The Cedar Valley Land and Cattle Company, Limited, a party to the above-mentioned suits, and petitions the court to enter an order or decree in· each of said cases showing that the matters in controversy therein have all been settled and compromised by the parties and are decreed and adjudged to be finally settled, and ordering that all the said cases be dismissed, the plaintiff in each to pay costs therein, and that the sureties on the injunction bond given by this petitioner be discharged.

" And in support of this application, the petitioner files herewith true copies of the written correspondence between the parties, embodying their agreement of compromise, and on the hearing of this petition will produce the originals thereof; also affidavit of George Dixon Fisher."

The correspondence was as set forth in the margin.[1]

---

[1] " Received November 12, 1885.

" Karnes and Waters will recommend any one of the following compromises:  .

The affidavits of Messrs. Fisher, McCrary and Field were also filed on behalf of appellees.

---

" 1.  C. & E. to be paid back the money for their stock, say $50,000.

" C. & E. to pay back the sum of $40,000.

" The company to enter its appearance in a suit to be brought by C. &. E. to determine the value of their services and commission in purchase of property, leaving out all transactions between C. & E. and W. B. M.

" 2.  The company to allow C. & E. $25,000 as their commissions for the purchase of the ranch, C. & E. to pay balance of $40,000, company to pay back amount of stock, each party to pay costs made by themselves.

" 3.  Arbitrate by three persons, one selected by each, they to choose a third, what their services shall be, and the company then to pay the amount set, C. & E. to pay $40,000 & company to pay amount of stock.

" Either proposition to be finality as to all the matters embraced in the bill filed by the Company *vs.* C. & E."

*Response to the proposition of Waters and Karnes, Attorneys for Coburn & Ewing.*

" Adams and Field and Geo. W. McCrary will recommend to their client, the Cedar Valley Land and Cattle Company, a settlement with Coburn and Ewing as follows :

" 1.  C. &. E. to be allowed for their stock what they have paid on it.

" 2.  C. & E. to pay back to the company the sum of $40,000.

" 3.  Ewing to surrender management.

" 4.  This settlement to be a full and final adjustment of all the controversies between the parties and of all claims of either party against the other.

" 5.  No delay of legal proceedings in consequence of these negotiations, unless by an agreement the controversies are ended.

" This proposition involves the surrender of the company's claim for the profit on the sale of the Delaware-street property, to which we think it entitled, and which will, we suppose, amount to about the sum of $15,000, as well as other claims set forth in its bill.

" And it involves also the allowance for the stock of C. & E. of about $10,000 more than its present value.

" These are, therefore, the most favorable terms we can recommend, and under no circumstances can we advise the payment of commissions to C. &. E., or any waiver of the company's right to defend against any claim that they may make on this account."

*From appellants' to appellees' counsel, December 28, 1885.*

" In the matter of controversy between the Cedar Valley Land and Cattle Company and Mess. Coburn & Ewing, it must have been observed that I have not seemed quite in accord with those associated with me.  I have always felt inclined to some amicable adjustment, and regretted when I was

Fisher stated that about the 29th of April, 1886, he called
upon Coburn and submitted to him the form of a bond to be

directed to terminate rather summarily the negotiations to that end under-
taken a few weeks ago. I have now taken the liberty of addressing you
this note entirely upon my own responsibility, and I am induced to do so by
a statement made to me by Mr. Gage, a mutual friend of both parties, to
the effect that he understood Mr. Fisher that the terms proposed by you in
our former negotiation were still open for acceptance. If such be the case
I say frankly to you that in my judgment the terms then proposed contain
substantially the correct basis of settlement, and I would like again to move
in the direction of ending all this interminable litigation. I do not wish to
trespass on your valuable time, and hence I have not called to present these
views in person, but if this letter receives a favorable response I will see
my clients and at some time, when agreeable to you, will call at your office to
canvass the matter more in detail. If it is thought best by you not to nego-
tiate further I would be glad that no mention be made of this letter."

*From appellees' to appellants' counsel, December* 28, 1885.

" Yours of this date received. Mr. Fisher is out of town and will not
return until the last of the week. I think, however, he is still disposed to
settle, and if you can bring your clients to agree to the terms proposed by
us let me know, and as soon as he returns I will see him and advise you.

" P. S. — I will not mention the matter to any one until I hear from you
further."

*From appellants' to appellees' counsel, December* 28, 1885.

" Upon the receipt of your communication of to-day I at once sought an
interview with my clients. Maj. Ewing is out of the city, and I only saw
Mr. Coburn, who thinks Maj. Ewing will agree to any arrangement that he
may make. He has much to say of the company's injustice to them in seek-
ing to appropriate without compensation the result of their labor and skill
in the purchase of this property. He contends that Munson was taken at a
time when for several reasons he was very anxious to sell, and that they
drove an unusually good bargain with him. Of course, I have sought to
impress upon him that the case must be tried squarely upon the law. I
have brought myself to believe that there is not much probability of your
recovering on account of the house and the bulls, but as to the commission
of $40,000 I have frankly said that I believed the chances were against my
clients. This amount represents the whole sum your company has lost,
while it has received the benefit of valuable services at no expense what-
ever. Any settlement made must involve an entire withdrawal of the inter-
ests of Coburn and Ewing. They insist that their stock is worth a pre-
mium, while, on the other hand, Mr. Fisher claims that it has depreciated. I
am aware that you have the impression that Burnett was not connected with
this sale, but in this it is more than probable that you are in error, and

given by Coburn and Ewing in pursuance of the terms of the compromise, to bind said firm not to buy up or otherwise

---

Coburn and Ewing have in their possession the proportional part realized coming to Burnett, amounting to $16,800. All these phases of the case I have gone over carefully with Mr. Coburn, and he has become willing to settle in a way approximately as follows:

" (1.) That the stock of Coburn and Ewing be taken at $50,000.

" (2.) That Coburn and Ewing pay back to the company the $40,000 received from Munson.

" (3.) That the company, with American securities, indemnify C. & E. against any claim of the representatives of Burnett as to the $16,800.

" (4.) That all suits be dismissed, each party paying his own costs, all. claims for damages or compensation be waived, and full receipts passed.

" (5.) That the salary of Ewing up to the time of his discharge be paid ·to him, amounting to about one month's pay, and that there be paid a few small items of expenses, amounting in all to a very small sum. As I understand, this is substantially your proposition to us. In a conversation with you I think you stated that you would favor the indemnity for the $16,800. I believe there is a controversy between Mr. Ewing and Mr. Fisher as to whether the company owes Ewing about a month's balance on salary. This, however, of course, can be settled by the books. If I have not made my proposition clear I will be glad to state it more fully, and upon Mr. Fisher's return I much hope a satisfactory adjustment can be made."

*From appellees' to appellants' counsel, January 5, 1886.*

" We were advised by the counsel of the Cedar Valley Land and Cattle Company in London that the company has no right either to purchase or provide for the cancellation of the stock now held by Coburn and Ewing. ·In view of this advice Mr. Fisher does not feel at liberty to conclude the settlement upon the basis of taking back the stock. If we could agree upon any settlement which would leave the stock in the hands of Coburn and Ewing, or which would not require the company to take it, Mr. Fisher would feel at liberty to act in the matter; but, as I assume that this cannot be accomplished, I have advised Mr. Fisher, who leaves for London in a few days, to lay the whole matter before the board and give us instructions which will, I hope, enable us to agree with you upon some disposition of the stock and upon a final satisfactory adjustment of the matters between the parties."

*From appellants' to appellees' counsel, January 8, 1886.*

" Your note of the 5th instant was duly received, stating that no further action could be taken in the matter of settling the dispute between the C. V. L. & C. Co. and Mess. Coburn and Ewing until Mr. Fisher had additional instructions from his company. I have delayed answering until I could confer with Mess. C. & E., which I now have done. They greatly regret

molest any of the range privileges of the company. The form of the bond had been changed by striking out the words " as

the delay that will be necessarily occasioned, as they hoped for a speedy termination of the controversy. I have urged upon them that they allow me to continue my efforts for an adjustment. This they have done, with the understanding that I request you to ask Mr. Fisher to report by cable at the earliest possible moment whether the proposition will be accepted. This is a matter involving so large an amount and requiring the taking of testimony at so many and such remote points that I assume that we are agreed as to the importance of determining this negotiation one way or another as soon as the same can be reasonably done.

"Awaiting your further advice, I am, very truly."

*From appellees' to appellants' counsel, January 11, 1886.*

" I have arranged with Mr. Fisher to cable me instructions from London as to compromise of the controversy between Coburn and Ewing and the C. V. L. & C. Company. I will advise you promptly when instructions are received."

*From appellants' to appellees' counsel, January 26, 1886.*

" Mess. Coburn & Ewing have 2000 shares in the C. V. L. & C. Co., £5 each paid, amounting to about $48.800. They will settle the controversy with the company —

" 1. By returning the $40,000 commission and the company's taking their stock at the actual amount paid by them; or,

" 2. They will turn over to the company 1600 shares and retain 400.

" 3. In any event C. & E. are to be protected against any claim by Burnett's estate, either by a release or indemnity.

" 4. Mess. C. & E. agree not to buy up or otherwise molest any of the ranch privileges now enjoyed by the company.

" 5. This settlement in no way to affect the arrangements heretofore made concerning the W. & L. cattle, but the same to be carried out by both parties in good faith as agreed upon, but not to enter into this arrangement in any way whatever. In other words, the W. & L. cattle are in no way taken into consideration in this settlement.

" 6. The balance of salary as compensation to be paid to Mr. Ewing."

*From appellees' to appellants' counsel, February 2, 1886.*

" I enclose herewith a letter just received from Mr. Fisher from New York, which explains itself. Mr. F. carries with him to London the several propositions of settlement which have been under discussion. Will you kindly advise me what response Coburn & Ewing have to make to the terms suggested in this letter? If possible I should like to be advised in time to write Mr. Fisher to-morrow, as requested.

" Please return Mr. Fisher's letter."

part and parcel of the" in the second line, and inserting in place thereof " in accordance with the terms of our letter of

---

*From Fisher to appellees' counsel, 29th January, 1886.*

"As I wired you yesterday, I am unfortunately here till to-morrow at 2 p. m., in consequence of the steamer I intended sailing with yesterday being disabled. I am sorry at this, as I am anxious to get to London to consult with my co-directors. I have been thinking a good deal over the best way to arrange a compromise with C. & E., but in every shape I take it it is always saddled with the difficulty of dealing with their stock.

" No one, of course, would be fool enough to take their shares at par when it is so generally known, and by none better than C. & E. themselves, that the values of all cattle shares are not within 20 per cent of what they were, and as the company itself can neither buy nor cancel it is most perplexing. The following is a proposition that has occurred to me that C. & E. might submit to the board : C. & E. agree to pay Co. the $5000 [$40,000] commission, with interest thereon at the rate of 8 per cent per annum for the time they have had it; C. & E. to retain their stock in company by the directors getting for them an advance on it for $40,000, at the rate of interest of ten per cent per annum, said advance to go to liquidate the debt to the company, C. & E., besides, paying the company's expense in connection with this litigation.

" This arrangement would enable C. & E. to hold their stock, which they appear to value so highly, until such time as they could sell it at par, or possibly, in two years, at a premium, and at the same time refund the $40,-000. The company would in this case not commence proceedings for damages caused by turning back the cattle. If you think well of this project you can see Karnes about it, and, if C. & E. are disposed to make the above proposition, cable the word ' consent' on 8th February, the day I expect to get to London. Frankly, I must say this is a more favorable settlement than I would give them, as I am satisfied there is more in the real estate than $15,000, but under the circumstances [it] might be accepted by the board.

" Of course, if there is no cablegram, I will understand they will not make this proposition; in any case, write not later than Wednesday."

---

*From appellants' to appellees' counsel, February 2, 1886.*

" I am just in receipt of your letter of to-day, including a letter from Mr. Fisher from N. Y., which I herewith return to you. You have heretofore seen fit to express your appreciation of what I had done and was doing to get this controversy settled, and hence I need not restate my endeavors in the matter. I am only sorry to see Mr. Fisher taking the position indicated by his letter. I am now convinced that Mr. Gage was correct in his opinion that he, F., was unfavorable to any settlement. The terms proposed in his letter I have not submitted nor will I submit to my clients. I have been satisfied from the beginning and am still satisfied, and have so stated to Mess. C. & E., that they are liable in law for the return of the $40,000,

date February 27, 1886, accepting terms of compromise," and Coburn added the following words: "of all pending litiga-

---

but I don't believe they are liable any further. This they ought to repay. On the other hand, this company had received the benefits of their labor without any expense. There ought to be some recognition of the equities of the case. On such a basis I have tried to have an adjustment made; but if it is the determination of Mr. Fisher to drive these men to the wall, then there is no alternative left but to fight. I shall still hope, however, that, through the coöperation of yourself and Mr. Gage a fair and just settlement may be made, and that the damage to the interests of all concerned, to which Mr. Fisher's rashness will lead, may be avoided. As Mr. Fisher mentioned my name in his letter, I would be glad to have him furnished a copy of this."

*Cablegram.*

"From London. Kansas City.

"Ewing's proposals declined. Letter posted to-day, enclosing complete answer to cross-bill and conveying the only terms which will be accepted. Inform Ewing."

*From appellees' to appellants' counsel, February 24, 1886.*

"I enclose copy of letter, just received from the secretary of the Cedar Valley Land and Cattle Company, submitting the only terms upon which the company will settle with Coburn and Ewing. The sum demanded is nominally larger than that offered by you, but as it is proposed to receive payment in cattle and the stock of the company now held by C. & E., at par, I am in hopes your clients will consider it better to accept than to continue the litigation.

"If this proposition is accepted please advise me before March 4th."

*From Coburn and Ewing to appellees' counsel, February 27, 1886.*

"On February 24th, 1886, you handed to J. V. C. Karnes, Esq., one of our counsel, a copy of a letter which you had just received from the secretary of the Cedar Valley Land and Cattle Company, which is as follows:

"'THE CEDAR VALLEY LAND AND CATTLE COMPANY, LIMITED,
"'MOORGATE STREET CHAMBERS, LONDON, E. C., *Feb.* 11, 1886.

"'DEAR SIR: The board have had under their very careful consideration Mess. Karnes & Waters's letter, dated the 26th of January, 1886, containing two alternative offers by Mess. Coburn and Ewing for the settlement of the claims made by the Cedar Valley Land and Cattle Company upon them.

"'I am instructed to inform you that neither of these propositions is acceptable, and that the action against Mess. Coburn and Ewing must proceed. With that view the answer to Mess. Coburn and Ewing's cross-bill has been forwarded to Mess. Adams and Field along with a letter from the solicitors of the company.

tion." The first sentence of the proposed bond was therefore amended so as to read as follows: " That for a good and valu-

---

" ' The company being liable in a large sum of costs, which will not be recovered from Mess. Coburn and Ewing, the only terms upon which the board can agree to compromise the claim of the company are as follows :

" ' 1. That the amount payable to the company by Mess. Coburn and Ewing be £10,000, the amount paid by them for the 2000 shares now standing in their names.

" ' 2. That this amount, £4000, shall be paid in cash, or in lieu thereof that the cattle of the L. & W. herd now upon the Cedar Valley ranch shall be accepted as cash, when counted over this spring, upon a valuation to be made by two valuers — one chosen by Coburn and Ewing and one by the company — the valuers appointing a referee.

" ' 3. That the balance then remaining due to the company will be discharged by the transfer to such person or persons as may be named by the board of a sufficient number of Mess. Coburn & Ewing's shares on the basis of a par value, the shares then remaining in the hands of Coburn & Ewing to be held by them for a period of not less than two years.

" ' 4. Mess. Coburn & Ewing to give security that they will not buy up or otherwise molest any of the range privileges now enjoyed by the company.

" ' 5. That the company agree to protect Coburn & Ewing against any claim from the executors of the partner of the late Geo. Burnett.

" ' When the board consider (1) that the issue has practically been decided against Mess. Coburn & Ewing by the same judge before whom the case will ultimately be tried; (2) that Mess. Coburn & Ewing have received from Mr. Munson the sum of $75,000 for a property which, in the written estimate of six of the eminent valuers in Kansas City, is worth from $45,000 to $50,000; (3) the almost insuperable difficulty which the board will have in placing any of the shares transferred by Mess. Coburn & Ewing, in consequence of the non-payment of a dividend, resulting from Mr. Ewing's vindictive or ill-judged action in ordering the beeves back to the ranch; and (4) the interest upon the amount of commission obtained in various ways from Mr. Munson from the period of its receipt up to the present date, which, we are advised, would be recoverable from them by an action at law, the board is of the opinion that the foregoing offer is more favorable to Mess. Coburn & Ewing than the latter had any right to expect. The board, however, is induced to offer these easier terms with the object of settling the matter before the general meeting of the 4th of March. It is therefore to be distinctly understood that this proposal only remains open until the 3d of March, and that failing the receipt on or before that date of a telegram announcing that Mess. Coburn & Ewing have signed an agreement embodying the above terms, the offer now made by the board is withdrawn on that day. It will suit the company infinitely better to receive the amount of their claim in cash, as would be the case when a judgment has been recovered in their favor, than to have to deal with any large num-

able consideration and in accordance with the terms of our let-
ter of date February 27, 1886, accepting terms of compromise

---

ber of shares transferred by Mess. Coburn & Ewing. It is to be understood
that the offer is to be made without prejudice to any claim for damages
which the board may have against the executors of the partner of the late
George Burnett.

" ' The directors desire me to add that in the event of the foregoing offer
being refused they will feel it their duty in the interests of the shareholders
to claim full compensation for damages which the company have sustained
under various heads, which are clearly attributable to the account of Mess.
Coburn & Ewing.                          I am, dear sir, yours truly,

" ' JAMES E. WEBB, *Sec'y*.

" ' Geo. W. McCrary, Kansas City, Mo., U. S. A.'

" And on February 26, 1886, you sent to Mr. Karnes the original letter
you had on that day received from the same party, and which was as
follows :

" ' THE CEDAR VALLEY LAND AND CATTLE COMPANY, LIMITED,

" ' MOORGATE STREET CHAMBERS, LONDON, E. C., *12th Febr.*, 1886.

" ' DEAR SIR : In reading over the letter which I had the pleasure to
address to you yesterday I noticed two points in reference to which I
would like to make some observations.

" ' The sum of £10,000 is fixed as the damages to be paid by Mess.
Coburn and Ewing, and it is added that this sum was the amount paid by
Mess. Coburn and Ewing for their shares. Seeing that there is no connec-
tion whatever between the claim for damages and the payment of shares, it
is advisable that the words " the amount paid by them for the 2000 shares
now standing in their names " be eliminated from the letter, if you think
advisable to read it or give a copy of it to Mess. Coburn and Ewing.

" ' The words " vindictive or ill-judged," on page 3 of the letter should
also be eliminated, as Mr. Ewing, in his letter of 24th October last, stated
that he was acting for the best interests of the stockholders in turning
back the beeves. These words are unnecessary, although the directors
could not possibly approve a step which precluded the possibility of paying
a dividend, the non-payment of which would have, as had been fully
explained to Mr. Ewing, such an injurious effect on an English company.
If Mess. Coburn and Ewing should prefer to deliver the cattle of the L. &
W. herd, now on the Cedar Valley ranch, the transfer of the 12,000 would be
accepted by the board at present, leaving the balance of £4000 to stand over
in the meantime.

" ' If the valuation of the L. W. herd shall eventually fall short of that
sum, the balance of such valuation to be made up to the company by the
transfer of an equivalent number of shares in the company on the basis of
a par value, the boarding of the above cattle to be paid for at the time of
transfer at the agreed-on rate, $1.50 per head.

of all pending litigation between us and the Cedar Valley Land and Cattle Company, Limited, etc." Affiant added that

---

" ' The board is quite ready to agree to Mr. Ewing's stipulation that he shall be paid his salary during such time as he remained in the service of the company, whatever amount may be found to be due to him upon a proper adjustment of accounts.

" ' Will you kindly bear these points in mind in dealing with the other side.

" ' I am, dear sir, yours truly,             JAMES E. WEBB, *See'y*.

" ' Geo. W. McCrary, Esq., Kansas City, Mo., U. S. A.'

" Both of these communications, together with your two letters forwarding them to Mr. Karnes, he has placed in our hands. In connection with both our counsel we have fully considered the terms of this proposition. We wish to state emphatically that we regard the proposition as unjust and oppressive, but we have so much involved in this litigation that we agree to and accept the terms of the offer made. The £4,000 will be arranged for with the L. W. cattle, as suggested in the letter of February 12th, and the 1200 shares of stock therein mentioned we herewith hand you, to be transferred to such parties as may be named. We have only two certificates of one thousand shares each, and we deliver both to you, and the company can return us a certificate for 800 shares. The bond called for by the fourth section of the proposition in the letter of February 11th we will give at any time. It will now soon be the season when the L. W. cattle can be counted, and we will be ready at once to name valuers. Now that a settlement has been effected, we hope there will be no delay in carrying it out in all respects as agreed upon.

" We desire to express to you our thanks for the uniform courtesy with which you have treated us throughout this unpleasant matter.

" We are, dear sir  very truly,             W. N. EWING.
                                            " JAMES M. COBURN.
                                            " COBURN & EWING."

*From appellees' counsel to appellants, February 27, 1886.*

" Mr. Karnes has handed me your letter accepting the terms of compromise proposed by the Cedar Valley Land & Cattle Company, and has also placed in my hands the certificates for the two thousand shares of stock held by you in the company. I will wire Mr. Webb, secretary of the company, that you have accepted in writing the company's proposition, and have written him, requesting that the company take immediate steps to choose a valuer and proceed with as little delay as possible to close up the matter of the compromise. Of course it is understood that the settlement embraces all the matters involved in the pending litigation in the several suits between the parties.

" The matter of costs and the balance due you on salary can easily be adjusted hereafter. Col. Karnes and I agree that each party pay its own costs."

he was present as a member of the board of directors of the Cattle company when the proposition of compromise was

---

*From appellees' to appellants' counsel, March 18, 1886.*

" I am just in receipt of a letter from James E. Webb, secretary of the Cedar Valley Land and Cattle Company, Limited, of date March 6th, of which I enclose you a copy. Mr. Webb sends me with this letter an assignment to be executed by Messrs. Coburn and Ewing, transferring to him 1200 shares of their stock in said company. When Mr. Webb wrote this letter he had not received my communication written on the 27th of February, informing him that Messrs. Coburn and Ewing had placed in my hands their certificates for the whole 2000 shares, and had requested that the company would issue to them a new certificate for 800 shares. That letter would reach London about the 7th inst., and an answer may be expected very soon. Probably it would be better to take no further action until it is received."

*From Webb, sec'y, to appellees' counsel.*

" LONDON, E. C., 6 *March*, 1886.

" DEAR SIR: I have to acknowledge the receipt, on the 27th February, of your cablegram of that date reading:

" ' Terms proposed accepted by Coburn & Ewing to-day in writing.'

" That telegram was laid before the board at their meeting on the 3d inst., and I am directed to inform you that they are glad that a settlement has been arrived at upon terms which they believe will be found upon consideration to be satisfactory to all parties. The board is prepared to find that all the obligations entered into by Mess. Coburn and Ewing will be faithfully and honorably carried out by these gentlemen, and they trust that amicable relations will be resumed and will continue uninterruptedly for the future.

" With the view to the carrying out of the provisions of the agreement with Mess. Coburn & Ewing, I now enclose a transfer of 1200 shares, to be executed in my favor, and the company undertake that, if the value of the L. W. herd shall exceed the sum of £4000, the difference shall be adjusted by the retransfer to Mess. Coburn and Ewing of shares to an equivalent value.

" Awaiting confirmation by letter of your cablegram of the 27th."

*From appellees' to appellants' counsel, March 27, 1886.*

" I am now advised that the Cedar Valley Land and Cattle Company cannot issue the new certificates for eight hundred shares of stock to Coburn and Ewing, as per terms of compromise, until the latter have assigned the twelve hundred shares. They therefore wish Mess. C. & E. to execute the inclosed assignment, to be sent by me to London. This done, they will immediately execute and send over the new certificates for eight hundred shares.

" Please have the assignment executed and return to me at the earliest time practicable, as I wish to forward it without delay."

agreed upon, and that it was intended that the same should be a full and final settlement of all pending litigation between the parties. The original paper referred to was attached.

Mr. McCrary testified that he had principal charge on behalf of the company of the negotiations for compromise and settlement between the parties; that the company and its counsel throughout the negotiations insisted that any settlement made should end the litigation, and the final proposition made by the company February 11 and 12 was not intended to be any departure from this condition, but on the contrary was submitted by this affiant as a proposition " to end the litigation," as appears by the letter transmitting the same; that neither he nor the company ever for a moment intended to settle the claims of the company against Coburn and Ewing, leaving their claims against it to be further litigated, and if Coburn and Ewing or their counsel had such an intention, it was unknown to this affiant at the time the settlement was entered into; that as soon as affiant heard an intimation that it might be claimed that the settlement did not cover all the matters in litigation, he wrote Coburn and Ewing the letter of February 27, 1886, which was written the same day the acceptance of the proposition of compromise was received, and before any steps were taken on behalf of the company by affiant to carry the same out; that if affiant had then been notified that Coburn and Ewing would insist that only one side of the controversy was settled, he would have tendered back the stock certificate and declined to go on with the compromise; and that, receiving soon after the paper filed with Mr. Fisher's affidavit, in which Coburn described the proposition accepted as one to settle " all pending litigation," affiant felt free to go on and perfect the compromise, believing that if Coburn and Ewing intended to attempt to reserve any right of action against the company, it must be on some cause of action not involved in the present litigation.

Mr. Field said that he was one of the attorneys of the Cattle company, and on the 27th of February, 1886, presented to Mr. Karnes a paper prepared after consultation with his associate counsel, which was destroyed or misplaced by affiant

after Mr. Karnes declined to sign the same; that the principal purpose in presenting such writing was to obtain the speedy and formal discharge of the sureties on the injunction bond, which purpose was explained to Karnes, though such paper did contain stipulations as to dismissing the bills and cross-bills at the costs of each party, respectively, all of which counsel for the Cattle company understood was already included in the settlement; and that when such paper was presented to Mr. Karnes, he replied that Mr. Coburn had gone to St. Louis, and that he would make no other agreement of settlement for Coburn and Ewing, but he assured affiant that the sureties on the injunction bond were not to be harmed or disturbed, and affiant dropped the matter and did not further urge Mr. Karnes' signature to such writing.

On behalf of appellants the affidavits of Karnes and Coburn were filed. Mr. Karnes stated that on the 27th of February, 1886, Mr. Field brought to his office a statement to the effect that the settlement of that day was to be in full of all claims or demands between the parties, and he distinctly told Mr. Field that such paper would not be signed, but that Coburn and Ewing had settled their matters with the Cattle company on the propositions of February 11 and 12 and the unconditional acceptance of these propositions by Coburn and Ewing, and that this settlement would not be supplemented by any further agreement. He further said the letter of acceptance had been prepared with the understanding that the terms of the compromise would be accepted only just in the way they were proposed and to cover nothing more; and that every letter and paper since, so far as his knowledge extended, had been prepared with the understanding that the settlement of February 27 spoke for itself, and that nothing was to be added thereto or subtracted therefrom.

Coburn testified that when the propositions of February 11 and 12 were considered, all previous propositions had been rejected; that the compromise proposed by the company would not have been accepted had it not been supposed that it was left open to Coburn and Ewing to assert any claim they had for services rendered in the purchase of the ranch. That in

the early correspondence this matter was referred to, but no mention was made in the later correspondence of this compensation, and consequently to avoid any misunderstanding, the terms proposed were unconditionally accepted; that the letter of Mr. McCrary of February 27, 1886, was received and submitted to affiant's counsel, who advised him that he had distinctly informed Mr. Field that receipts in full were not to be passed, and that there was therefore no necessity of making any reply to Mr. McCrary's letter, for which reason he did not answer the same; that in every step taken in closing up said compromise, Coburn and Ewing had distinctly refused to sign any receipts in full or acknowledge any settlement in full, and that in the many receipts passed, language indicating a settlement in full was in each case stricken out, and in lieu thereof it was inserted that the receipt was given on the basis of the letters of February 11 and 12 and the acceptance of February 27; that affiant had no recollection concerning the interlineation of the paper attached to Fisher's affidavit, but he knew that there was no intention to convey the impression that Coburn and Ewing intended to abandon their claim for services; and that every step taken in the purchase of the ranch was in the utmost good faith and with strict regard to the interests of the company, and Coburn and Ewing had paid to it more than they ever received from Munson, and had received no compensation whatever for their services in the purchase of the ranch.

A hearing having been had, the court rendered a decree in each of the four cases, finding that there had been by the agreement of the parties a full compromise and settlement of all the matters in controversy in the case, and ordering, in pursuance of the agreement, that each of the bills be dismissed at plaintiffs' costs, to be taxed. The opinion of Judge Brewer will be found in 29 Fed. Rep. 584.

On the same day, Coburn and Ewing moved the court to set aside and vacate the decree entered in each of said causes and to grant them a rehearing, which motions were overruled, the Circuit Court delivering an opinion reported in 29 Fed. Rep. 586. Thereupon the cases were brought to this court by appeal.

*Mr. L. C. Krauthoff* (with whom was *Mr. Henry N. Ess* on the brief) for appellants.

*Mr. Morgan H. Beach*, for appellee, submitted on his brief.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

We are entirely satisfied with the conclusion of the Circuit Court, upon the evidence, that all the matters in controversy between the parties had been fully compromised and settled. The litigation was being prosecuted upon two bills and two cross-bills when the negotiations commenced, and involved the claims of the company against Coburn and Ewing and the claim of Coburn and Ewing for compensation for services rendered in the purchase of the ranch. No reason appears for the severance of claims so intimately connected, and the reservation of the latter, while the former were settled. The proposition from Coburn and Ewing's solicitors of November 12 embraced three distinct offers, and each offer included compensation for services in and about the purchase. The response to this proposition stated what the counsel for the Cattle company would recommend; the settlement so recommended "to be a full and final adjustment of all the controversies between the parties, and of all claims of either party against the other," and that counsel would under no circumstances "advise the payment of commissions to C[oburn] and E[wing], or any waiver of the company's right to defend against any claim that they may make on this account." It is ingeniously argued by appellants' counsel that by this last clause it was intended to so exclude from the settlement this claim for compensation as to leave it outstanding to be litigated. But we think, on the contrary, that it was expressed with sufficient clearness that the company would not be advised to consider any offer of settlement except upon the condition of the surrender of this claim, and that it was for this reason that the negotiations were at that time terminated. Upon the 28th of December the negotiations were renewed

upon the basis of the terms suggested by the Cattle company, and the first letter of appellants' solicitor of that date declares that "the terms then proposed contain substantially the correct basis of settlement" and expresses the desire "again to move in the direction of ending all this interminable litigation." Appellees' counsel at once replied that "if you can bring your clients to agree to the terms proposed by us let me know."

On the same day appellants' solicitor, after going over the matter carefully with Mr. Coburn, wrote, proposing: "(1.) That the stock of Coburn and Ewing be taken at $50,000. (2.) That Coburn and Ewing pay back to the company the $40,000 received from Munson. (3.) That the company, with American securities, indemnify Coburn and Ewing against any claim of the representatives of Burnett as to the $16,800. (4.) That all suits be dismissed, each party paying his own costs, all claims for damages or compensation be waived, and full receipts passed. (5.) That the salary of Ewing up to the time of his discharge be paid to him, amounting to about one month's pay, and that there be paid a few small items of expenses, amounting in all to a very small sum. As I understand, this is substantially your proposition to us."

To this appellees' counsel responded on January 5, 1886, that London counsel had advised that the company could not purchase or provide for the cancellation of the stock held by Coburn and Ewing, and therefore that Fisher did not feel at liberty to conclude the settlement upon the basis of taking back the stock, though he would, if a settlement could be agreed on which would leave the stock in the hands of Coburn and Ewing, or which would not require the company to take it.; and that he had advised Fisher, who was leaving for London, to lay the whole matter before the board for instructions, which he hoped would enable "us to agree with you upon some disposition of the stock and upon a final satisfactory adjustment of the matters between the parties." On the 26th of January, appellants' solicitors wrote that Coburn and Ewing would settle "the controversy with the company — (1) By returning the $40,000 commission and the company taking their stock at the actual price paid by them; or, (2) they will

turn over to the company 1600 shares and retain 400. (3) In any event, C. & E. are to be protected against any claim by Burnett's estate, either by a release or indemnity. (4) Mess. C. & E. agree not to buy up or otherwise molest any of the range privileges now enjoyed by the company. (5) This settlement in no way to affect the arrangements heretofore made concerning the W. & L. cattle but the same to be carried out by both parties in good faith as agreed upon, but not to enter into this arrangement in any other way whatever. In other words, the W. & L. cattle are in no way taken into consideration in this settlement. (6) The balance of salary as compensation to be paid to Mr. Ewing." This letter should be read in connection with that of December 28, for its apparent object was to accommodate the objection in relation to the stock, as well as to except the W. & L. cattle. The language in respect to the waiver of all claims for damages or compensation and the passing of full receipts, was not repeated; but, taken in connection with the original response of the Cattle company and what had followed thereon, the Cattle company and its counsel could not have understood that there was an intentional reservation of the question of compensation. The controversy referred to, January 26, was the same controversy referred to in the letter of January 8, of the same counsel, and must be held to have covered the entire controversy in respect to which the parties were treating.

On the 2d of February appellees' counsel enclosed the letter received from Mr. Fisher from New York, in answer to which appellants' counsel, referring to the suggestions of Fisher in relation to certain details of the settlement growing out of the difficulty in dealing with Coburn and Ewing's stock in the company, replied, saying, among other things, that Coburn and Ewing ought to repay the $40,000, but "on the other hand this company has received the benefits of their labor without any expense." Fisher carried with him to London, as appellants were informed, "the several propositions of settlement which have been under discussion," and which bore upon their face the concession that Coburn and Ewing no longer claimed to be entitled to compensation.

Upon the 24th of February the copy of the letter from the secretary of the Cattle company was sent to appellants, stating that the board of directors had had under consideration the two alternative offers of the 26th of January for the settlement of the claims made by the Cattle company, and that neither of these propositions was acceptable. These alternative offers related to the company's taking Coburn and Ewing's stock at the actual amount paid by them, or taking 1600 shares and retaining 400. The secretary then proceeded to state " the only terms upon which the board can agree to compromise the claim of the company," which terms required the payment by Coburn and Ewing of £10,000, £4,000 in cash or in L. & W. cattle, and the remainder by a sufficient number of shares on the basis of par value; and the giving of security by Coburn and Ewing not to interfere with the company's range privileges; and agreed to the indemifying of Coburn and Ewing against any claim from Burnett's or his partner's executors. And the letter says that in view of the facts " that the issue has practically been decided against Mess. Coburn and Ewing by the same judge before whom the case will ultimately be tried," the amount of money received by them from Munson, and the difficulty in placing any of the shares, etc., the board is of opinion that the offer is favorable to Coburn and Ewing, but " is induced to offer these easier terms with ·the object of settling the matter before the general meeting of the 4th of March." This would repay the company $50,000 instead of $40,000 but only $20,000 would be paid in cash or cattle, and the remainder in shares.

The contention seems to be that, as the terms of compromise mentioned in the secretary's letter addressed to the Cattle company's attorney, did not specifically allude to the claim for compensation, both parties had made and received propositions in which that claim was left open to litigation, and therefore, appellants could accept the proposition contained in the secretary's letter, and at the same time reserve the objectionable claim. But we do not agree ·with that view, as already indicated, and are of opinion that Coburn and Ewing must have known that the intention of the company was to

settle the entire matters of difference between them, and that in no event would the company entertain any claim for compensation on their part. This must be so, since the whole theory of the negotiation, renewed December 28, conceded the terms of the company's solicitors in response to the proposition of November 12, as the correct basis of settlement, and those terms embraced the rejection of the item of commissions, which was so well understood that appellants' letter of December 28 expressly said that all claims for damages or compensation were to be waived and full receipts passed. What the board was considering, as appellants must be held to have known, was what appellants should pay and how they should pay it, and it was only in regard to the disposition of their stock that any difficulty arose in substantially arriving at a final conclusion before Fisher went to London.

It was claimed by the company that the stock was not worth its par value on account of certain action on Ewing's part, which turned out to be ill-advised, and the directors considered that although they asked Coburn and Ewing to pay $50,000 instead of $40,000 as offered, yet as the larger part of this was to be taken in their stock at par, it was a liberal offer on the company's part, in view of all the other facts and circumstances surrounding the transaction. And to this Mr. McCrary alludes in his letter of February 24, when he says: "The sum demanded is nominally larger than that offered by you; but, as it is proposed to receive payment in cattle and the stock of the company now held by C. and E. at par, I am in hopes your clients will consider it better to accept than to continue the litigation."

The secretary assumed, as we think he had a right to do, that the claim for compensation on the part of Coburn and Ewing had been dismissed as inadmissible, and that his letter to the counsel of the company need only name the terms upon which the company's claim was to be compromised. The attempt, by the letter of February 27, 1886, reciting the secretary's letters, to so limit the compromise as to reserve the right to litigate the question of compensation, is not commendable. Appellants could not in good faith restrict their settlement in

this way, nor attribute the courtesy with which Mr. McCrary had acted as extending to a concession which he had refused to make at the very threshold. And when he notified Coburn and Ewing, on the 27th of February, that " it is understood that the settlement embraces all the matters involved in the pending litigation in the several suits between the parties," it was their duty, if that were not so, to have so advised him at once.

What passed between Mr. Karnes and Mr. Field is in dispute, but it is clear enough that it could not control so important a difference, if it really existed. The letter of Mr. McCrary informed Coburn and Ewing that he should wire the company of its acceptance of the proposition, and his affidavit shows that this letter was written before he had taken any steps to carry out the compromise on behalf of the company. The subsequent letters in March of Mr. McCrary and of the company demonstrated their understanding that the entire controversy was settled, which indeed was the only motive of any negotiations at all.

The grounds upon which the Cattle company resisted the claim for compensation are too obvious to require comment, and were the same which justified the removal of their agent from his agency. We do not doubt that the compromise covered all the matters in controversy; that this was understood by the parties with whom they were dealing; and that the latter were bound, as the court held, in the premises.

But, although the decision of the court was correct upon the merits, it is objected that the decrees in question were improperly rendered, for want of jurisdiction to proceed upon the petitions. Undoubtedly the ordinary rule would have required the matter of the settlement to be presented by a supplemental bill or cross-bill or a bill in that nature; and these decrees were rendered upon petition only. But this objection was not raised until after a decision rendered. Appellants appeared in answer to the petitions, and introduced affidavits to support their views of the meaning to be attached to the correspondence, and they insisted that their claim for compensation was not embraced in the •compromise, and, therefore, that the dismissal of the bills should be without prejudice.

The case of *Kelsey* v. *Hobby*, 16 Pet. 269, 277, is decisive against this objection. There a release was filed in a chancery suit by the defendant, who moved to dismiss the bill, which motion was opposed upon the ground that the release was obtained by duress. The parties went on to take testimony as to the circumstances under which the release was given, and it was held by the court, speaking through Mr. Chief Justice Taney: " Some objections have been made as to the manner in which the release was introduced into the proceedings. It was filed in the cause, and a motion thereupon made to dismiss the bill; and it is said that, being executed while the suit was pending, and after the answers were in and the accounts before the master, it should have been brought before the court by a cross-bill or supplemental answer, and could not in that stage of the proceedings be noticed by the court in any other way. It is a sufficient answer to this objection to say that it was admitted in evidence without exception, and both parties treated it as properly in the cause; and the complainant proceeded to take testimony to show that it was obtained from him by duress, and the defendants to show that it was freely and voluntarily given. It had the same effect that it would have had upon a cross-bill or supplemental answer, and the complainant had the same opportunity of impeaching it. And there is no propriety in requiring technical and formal proceedings, when they tend to embarrass and delay the administration of justice; unless they are required by some fixed principles of equity law, or practice, which the court would not be at liberty to disregard." In *Gilbert*·v. *Endean*, 9 Ch. D. 259, 267, Sir George Jessel, Master of the Rolls, uses this language: "I think a Court of Appeal cannot refuse to decide on the merits where the parties in the court below argued the case on the merits without objecting to the evidence. They must be taken to have assented to having their rights decided on the motion according to the usual rules governing interlocutory motions. If they wished them to be decided otherwise, they should have objected to the reception of the evidence. I think it is impossible for the appellant to succeed upon that ground, not having taken that course in the court below."

These cases are cited by appellees together with *Pryer* v. *Gribble*, L. R. 10 Ch. 534; *Tebbutt* v. *Potter*, 4 Hare, 164; *Askew* v. *Millington*, 9 Hare, 65. *Forsyth* v. *Manston*, 5 Madd. 78, *Wood* v. *Rowe*, 2 Bligh, 595, 617, *Rowe* v. *Wood*, 1 Jac. & Walk. 315, 337, and *Tebbutt* v. *Potter*, 4 Hare, 164, were referred to in *Askew* v. *Millington*; and Vice Chancellor Turner held, where the agreement of compromise went beyond the ordinary range of the court in the existing suit, and the right to enforce the agreement in that suit was disputed, that the proper course for proceedings to enforce it was by bill for specific performance, and not by motion or petition in the original suit to stay the proceedings, and he thought this must necessarily be so where the agreement itself was disputed. But, under the circumstances, we have already held that the petitioners' case did not fail upon the merits, and as all parts of the agreement fell within the range of the suits, and appellants did not dispute the form of proceeding, we are of opinion that the decrees cannot be reversed upon this ground. They are therefore

*Affirmed.*